8 Cal.Rptr.3d 541 (2004)
82 P.3d 747
32 Cal.4th 160
ESTATE OF Arthur Patrick FORD, Deceased.
Terrold Bean, Petitioner and Appellant,
v.
John J. Ford III et al., Objectors and Respondents.
No. S105508.
Supreme Court of California.
January 15, 2004.
As Modified on Denial of Rehearing February 4, 2004.
*542 Patrick Sullivan, Oakland, for Petitioner and Appellant.
Thomas J. Williams, San Francisco, for Objectors and Respondents.
WERDEGAR, J.
Terrold Bean claims the right to inherit the intestate estate of Arthur Patrick Ford as Ford's equitably adopted son. The superior court denied the claim, and the Court of Appeal affirmed the denial, for lack of clear and convincing evidence that *543 Ford intended to adopt Bean. After reviewing California case law on equitable adoption, we conclude that no equitable adoption is shown unless the parties' conduct and statements clearly and convincingly demonstrate an intent to adopt. We will therefore affirm the judgment of the Court of Appeal.

FACTUAL AND PROCEDURAL BACKGROUND
Born in 1953, Bean was declared a ward of the court and placed in the home of Ford and his wife, Kathleen Ford, as a foster child in 1955. Bean never knew his natural father, whose identity is uncertain, and he was declared free of his mother's control in 1958, at the age of four. Bean lived continuously with Mr. and Mrs. Ford and their natural daughter, Mary Catherine, for about 18 years, until Mrs. Ford's death in 1973, then with Ford and Mary Catherine for another two years, until 1975.
During part of the time Bean lived with the Fords, they cared for other foster children and received a county stipend for doing so. Although the Fords stopped taking in foster children after Mrs. Ford became ill with cancer, they retained custody of Bean. The last two other foster children left the home around the time of Mrs. Ford's death, but Bean, who at 18 years of age could have left, stayed with Ford and Mary Catherine.
Bean knew the Fords were not his natural parents, but as a child he called them "Mommy" and "Daddy," and later "Mom" and "Dad." Joan Malpassi, Mary Catherine's friend since childhood and later administrator of Ford's estate, testified that Bean's relationship with Mary Catherine was "as two siblings" and that the Fords treated Bean "more like Mary rather than a foster son, like a real son was my observation." Mary Catherine later listed Bean as her brother on a life insurance application.
Bean remained involved with Ford and Mary Catherine even after leaving the Ford home and marrying. Ford loaned Bean money to help furnish his new household and later forgave the unpaid part of the debt when Bean's marriage was dissolved. Bean visited Ford and Mary Catherine several times per year both during his marriage and after his divorce. When Ford suffered a disabling stroke in 1989, Mary Catherine conferred with Bean and Malpassi over Ford's care; Ford was placed in a board and care facility where Bean continued to visit him regularly until his death in 2000.
Mary Catherine died in 1999. Bean and Malpassi arranged her funeral. Bean petitioned for Malpassi to be appointed Ford's conservator, and with Malpassi's agreement Bean obtained a power of attorney to take care of Ford's affairs pending establishment of the conservatorship. Bean also administered Mary Catherine's estate, which was distributed to the Ford conservatorship. When a decision was needed as to whether Ford should receive medical life support, Malpassi consulted with Bean in deciding he should. When Ford died, Bean and Malpassi arranged the funeral.
The Fords never petitioned to adopt Bean. Mrs. Ford told Barbara Carter, a family friend, that "they wanted to adopt Terry," but she was "under the impression that she could not put in for adoption while he was in the home." She worried that if Bean was removed during the adoption process he might be put in "a foster home that wasn't safe."
Ford's nearest relatives at the time of his death were the two children of his predeceased brother, nephew John J. Ford III and niece Veronica Newbeck. Neither had had any contact with Ford for about 15 years before his death, and neither *544 attended his funeral. John J. Ford III filed a petition to determine entitlement to distribution (Prob.Code, § 11700), listing both himself and Newbeck as heirs. Bean filed a statement of interest claiming entitlement to Ford's entire estate under Probate Code sections 6454 (foster child heirship) and 6455 (equitable adoption) as well as sections 6402, subdivision (a) and 6450.
After trial, the superior court ruled against Bean. The doctrine of equitable adoption, the trial court found, was inapplicable because "there is no evidence that [Ford] ever told [Bean] or anyone else that he wanted to adopt him nor publicly told anyone that [Bean] was his adopted son." There was thus no clear and convincing evidence of "an intent to adopt."
Bean appealed only on the equitable adoption issue. The Court of Appeal affirmed, agreeing with the trial court that equitable adoption must be proven by clear and convincing evidence. Moreover, the reviewing court held, any error by the trial court in this respect would be harmless because the evidence did not support equitable adoption on any standard of proof "for the same reasons articulated by the trial court."
We granted Bean's petition for review.

DISCUSSION
Chapter 2 of part 2 of division 6 of the Probate Code,[1] sections 6450 to 6455, defines the parent-child relationship for purposes of intestate succession. Section 6450, subdivision (b) provides that such a relationship exists between adopting parents and the adopted child. Section 6453, subdivision (a) provides that the relationship exists between a child and a presumptive parent under the Uniform Parentage Act. Section 6454 delineates the circumstances in which a foster parent or stepparent is deemed a parent for the purpose of succession, requiring both a personal relationship beginning during the child's minority and enduring for the child's and parent's joint lifetimes, and a legal barrier but for which the foster parent or stepparent would have adopted the child. (See generally Estate of Joseph (1998) 17 Cal.4th 203, 208-212, 70 Cal.Rptr.2d 619, 949 P.2d 472.) Finally, section 6455 provides in full: "Nothing in this chapter affects or limits application of the judicial doctrine of equitable adoption for the benefit of the child or the child's issue." We therefore look to decisional law, rather than statute, for guidance on the equitable adoption doctrine's proper scope and application.

I. Criteria for Equitable Adoption
In its essence, the doctrine of equitable adoption allows a person who was accepted and treated as a natural or adopted child, and as to whom adoption typically was promised or contemplated but never performed, to share in inheritance of the foster parents' property. "The parents of a child turn him over to foster parents who agree to care for him as if he were their own child. Perhaps they also agree to adopt him. They do care for him, support him, educate him, and treat him in all respects as if he were their child, but they never adopt him. Upon their death he seeks to inherit their property on the theory that he should be treated as if he had been adopted. Many courts would honor his claim, at least under some circumstances, characterizing the case as one of equitable adoption, or adoption by estoppel, or virtual adoption, *545 or specific enforcement of a contract to adopt." (Clark, The Law of Domestic Relations in the United States (2d ed.1988) § 20.9, p. 925.) The doctrine is widely applied to allow inheritance from the adoptive parent: at least 27 jurisdictions have so applied the doctrine, while only 10 have declined to recognize it in that context. (Annot., Modern Status of Law as to Equitable Adoption or Adoption by Estoppel (1980) 97 A.L.R.3d 347, § 3.)[2]
A California court first recognized the doctrine, albeit in the atypical context of inheritance through the adoptive parent, in Estate of Grace (1948) 88 Cal.App.2d 956, 200 P.2d 189. A California couple had taken custody of and raised a Texas girl, Edna Grace, having recorded in Texas a statement that they "`hereby adopt'" the child, who was to be their heir and "`a member of our family, with all the rights and privileges as if born to us.'" (Id. at p. 957, 200 P.2d 189.) Although Texas adoption law at that time did not recognize inheritance from an adoptive grandparent through an adoptive parent (id. at pp. 959-960, 200 P.2d 189), the California court upheld Grace's daughter's entitlement to inherit from her adoptive grandparents as a matter of contract.[3] The parents had offered to adopt Grace and make her a full member of their family, and "[t]he child, by living with them as a member of the family, accepted the offer," creating a contract concluded and performed in California. (Estate of Grace, supra, at p. 962, 200 P.2d 189.) Quoting from a treatise, the appellate court noted that "`the courts, in their effort to protect and promote the welfare of the child, have given effect to a contract to adopt, where it has been fully performed on the part of the child, although it was invalid under the laws where it was made.'" (Id. at p. 963, 200 P.2d 189.)
This court decided its only case relating to equitable adoption nine years later. (Estate of Radovich, supra, 48 Cal.2d 116, 308 P.2d 14.) The question before us was not whether the child could inherit as an equitable adoptee  a final superior court decree established that he could  but the child's status, for purposes of inheritance taxation, as either the decedent's adopted child or a stranger in blood to the decedent. (Id. at pp. 118-119, 308 P.2d 14.) The majority took the former view, but its opinion rested on the in rem character of the superior court's probate decree and did not address the contours of the equitable adoption doctrine. (Id. at pp. 119-124, 308 P.2d 14.)
Justice Schauer's dissenting opinion, however, addressed the equitable adoption doctrine at some length, concluding the child took solely by virtue of an unperformed contract of adoption and thus as a stranger in blood. (Estate of Radovich, supra, 48 Cal.2d at pp. 129-135, 308 P.2d 14 (dis. opn. of Schauer, J.).) Citing sister-state authority, Justice Schauer explained: "When the child takes property in such a case it is as a purchaser by virtue of the contract [citation] and by way of damages or specific performance [citations]. *546 ... The child shares in the estate of the deceased foster parent as though his own child but not as such. In order to do justice and equity, as far as possible, to one who, though having filled the place of a natural born child, through inadvertence or fault has not been legally adopted, the court enforces a contract under which the child is entitled to property, declaring that as a consideration on the part of the foster parents a portion of their property will pass on their death to the child." (Id. at p. 130, 308 P.2d 14.)
Although expressed in a dissenting opinion, Justice Schauer's explanation of the doctrine has been widely cited and relied upon by the Courts of Appeal. Estate of Rivolo (1961) 194 Cal.App.2d 773, 15 Cal.Rptr. 268 presented the issue in the straightforward context of intestate succession from the adoptive parent. The child was an eight-year-old orphan when the foster parents took her in and "told [her] that she would live with them and be their little girl," an arrangement she said pleased her. (Id. at p. 775, 15 Cal.Rptr. 268.) The foster parents took the child to the courthouse, where they took out letters of guardianship but told the child she was being adopted. Thereafter they referred to her as their adopted daughter. As a child, the daughter helped them in their business, and even after her marriage they remained "exceedingly close." (Id. at p. 776, 15 Cal.Rptr. 268.)
Citing Estate of Radovich, supra, 48 Cal.2d 116, 308 P.2d 14, the Rivolo court held it "well established that equity will specifically enforce an oral contract to adopt" and found that the record "establishes the existence of a contract of adoption and respondent's part performance thereof by clear, convincing and unequivocal evidence. It is uncontroverted that the respondent was at all times regarded and treated as the adopted daughter of the Rivolos; that they told her and others on numerous occasions that she was legally adopted and would be their sole heir." (Estate of Rivolo, supra, 194 Cal.App.2d at p. 777, 15 Cal.Rptr. 268.) "[U]nder the circumstances, equity demands recognition of her lifelong status as an adopted child of Frank Rivolo and her inheritance rights [citations]." (Id. at p. 778, 15 Cal.Rptr. 268.)
Estate of Wilson (1980) 111 Cal.App.3d 242, 168 Cal.Rptr. 533 also presented the question of intestate succession from the adoptive parent. The child, born in a home for unwed mothers, was placed with foster parents who petitioned to adopt him. The adoption petition was dismissed, however, because the natural mother's consent could not be obtained; although the court record refers to an "abandonment petition ... to be filed," the foster parents did not pursue that remedy and apparently made no further efforts to adopt. They nonetheless told the child he was adopted and treated him in all respects as their son; their relationship remained warm and familial until the deaths of both parents. (Id. at pp. 248-249, 168 Cal.Rptr. 533.) Following both Estate of Rivolo and Estate of Radovich, the appellate court regarded the issue as one of "the right of an equitably adopted child to inherit by virtue of contract" (Estate of Wilson, supra, at p. 247, 168 Cal.Rptr. 533) and found substantial evidence "that, according to the above-noted authority, the Wilsons and Keith had entered into a contract of adoption which was faithfully adhered to by them" (id. at p. 249, 168 Cal.Rptr. 533).
In Estate of Bauer (1980) 111 Cal.App.3d 554, 168 Cal.Rptr. 743, an inheritance tax case, the court found insufficient evidence of equitable adoption  the child did not live with the asserted parents either as a minor or for any extended time as an adult, and did not assume "any *547 duties normally associated with a parent-child relationship" (id. at p. 559, 168 Cal.Rptr. 743)  but aptly summarized the doctrine as it had developed in California: "[E]quitable adoption requires some form of agreement to adopt, coupled with subsequent objective conduct indicating mutual recognition of an adoptive parent and child relationship to such an extent that in equity and good conscience an adoption should be deemed to have taken place." (Id. at p. 560, 168 Cal.Rptr. 743.)
In Mingo v. Heckler (9th Cir.1984) 745 F.2d 537, the federal court expanded on Bauer's agreement-plus-conduct analysis, distilling from the California decisions factors tending to show mutual recognition of a parent and child relationship: "[T]he adoptee lived with the adoptive parent for a number of years; the adoptee assumed the adoptive parent's surname; the adoptive parent told the adoptee that he or she was adopted; the adoptive parent publicly acknowledged the adoptee as his or her child; the adoptee considered and conducted himself or herself as a natural child; the adoptee worked or performed services for the adoptive parent; and the adoptive parent attempted legally to adopt or obtained guardianship papers for the child. Because the factors are merely examples of the type of conduct demonstrating an adoptive parent and child relationship, the claimant need not demonstrate that she satisfies every factor." (Id. at p. 539.) The court held that the child, who had lived with her grandmother and the grandmother's cohabitant from infancy, was entitled to Social Security benefits as the cohabitant's equitably adopted child. (Id. at pp. 538-540.)
As reflected in this summary, California decisions have explained equitable adoption as the specific enforcement of a contract to adopt. Yet it has long been clear that the doctrine, even in California, rested less on ordinary rules of contract law than on considerations of fairness and intent for, as Justice Schauer put it, the child "should have been" adopted and would have been but for the decedent's "inadvertence or fault." (Estate of Radovich, supra, 48 Cal.2d at pp. 134, 130, 308 P.2d 14 (dis. opn. of Schauer, J.), italics omitted.) In the earliest case, Estate of Grace, the court quoted a New Mexico case explaining why specific performance was an unrealistic description of equitable adoption: "`A specific performance of a contract to adopt is impossible after the death of the parties who gave the promise. Equity was driven to the fiction that there had been an adoption. That fiction being indulged, the case was not one of specific performance.'" (Estate of Grace, supra, 88 Cal.App.2d at pp. 964-965, 200 P.2d 189, quoting Wooley v. Shell Petroleum Corporation (1935) 39 N.M. 256, 45 P.2d 927, 931-932.) In both Estate of Rivolo, supra, 194 Cal.App.2d 773, 15 Cal.Rptr. 268, and Estate of Wilson, supra, 111 Cal.App.3d 242, 168 Cal.Rptr. 533, moreover, the contracts purportedly being enforced were made between foster parents and their minor charges, yet neither court addressed the children's capacity to contract, suggesting, again, that the contract served mainly as evidence of the parties' intent, rather than as an enforceable legal basis for transmission of property.[4]
*548 Bean urges that equitable adoption be viewed not as specific enforcement of a contract to adopt, but as application of an equitable, restitutionary remedy he has identified as quasi-contract or, as his counsel emphasized at oral argument, as an application of equitable estoppel principles. While we have found no decisions articulating a quasi-contract theory, courts in several states have, instead of or in addition to the contract rationale, analyzed equitable adoption as arising from "a broader and vaguer equitable principle of estoppel." (Clark, The Law of Domestic Relations in the United States, supra, at p. 926.)[5] Bean argues Mr. Ford's conduct toward him during their long and close relationship estops Ford's estate or heirs at law from denying his status as an equitably adopted child.
For several reasons, we conclude the California law of equitable adoption, which has rested on contract principles, does not recognize an estoppel arising merely from the existence of a familial relationship between the decedent and the claimant. The law of intestate succession is intended to carry out "`the intent a decedent without a will is most likely to have had.'" (Estate of Griswold (2001) 25 Cal.4th 904, 912, 108 Cal.Rptr.2d 165, 24 P.3d 1191.) The existence of a mutually affectionate relationship, without any direct expression by the decedent of an intent to adopt the child or to have him or her treated as a legally adopted child, sheds little light on the decedent's likely intent regarding distribution of property. While a person with whom the decedent had a close, caring and enduring relationship may often be seen as more deserving of inheritance than the heir or heirs at law, whose personal relationships with the decedent may have been, as they were here, attenuated, equitable adoption in California is neither a means of compensating the child for services rendered to the parent nor a device to avoid the unjust enrichment of other, more distant relatives who will succeed to the estate under the intestacy statutes. Absent proof of an intent to adopt, we must follow the statutory law of intestate succession.
In addition, a rule looking to the parties' overall relationship in order to do equity in a given case, rather than to particular expressions of intent to adopt, would necessarily be a vague and subjective one, inconsistently applied, in an area of law where "consistent, bright-line rules" (Estate of Furia, supra, 103 Cal.App.4th at p. 6, 126 Cal.Rptr.2d 384) are greatly needed. Such a broad scope for equitable adoption would leave open to competing claims the estate of any foster parent or stepparent who treats a foster child or stepchild lovingly and on an equal basis with his or her natural or legally adopted children. A *549 broad doctrine of equitable adoption would also render section 6454, in practice, a virtual nullity, since children meeting the familial-relationship criteria of that statute would necessarily be equitable adoptees as well.
While a California equitable adoption claimant need not prove all the elements of an enforceable contract to adopt, therefore, we conclude the claimant must demonstrate the existence of some direct expression, on the decedent's part, of an intent to adopt the claimant. This intent may be shown, of course, by proof of an unperformed express agreement or promise to adopt. But it may also be demonstrated by proof of other acts or statements directly showing that the decedent intended the child to be, or to be treated as, a legally adopted child, such as an invalid or unconsummated attempt to adopt, the decedent's statement of his or her intent to adopt the child, or the decedent's representation to the claimant or to the community at large that the claimant was the decedent's natural or legally adopted child. (See, e.g., Estate of Rivolo, supra, 194 Cal.App.2d at p. 775, 15 Cal.Rptr. 268 [parents who orally promised child she would "be their little girl" later told her and others they had adopted her]; Estate of Wilson, supra, 111 Cal.App.3d at p. 248, 168 Cal.Rptr. 533 [petition to adopt filed but dismissed for lack of natural mother's consent]; Estate of Reid (1978) 80 Cal.App.3d 185, 188, 145 Cal.Rptr. 451 [written agreement with adult child].)
Thus, in California the doctrine of equitable adoption is a relatively narrow one, applying only to those who "`"though having filled the place of a natural born child, through inadvertence or fault [have] not been legally adopted,"' [where] the evidence establishes an intent to adopt." (Estate of Furia, supra, 103 Cal.App.4th at p. 5, 126 Cal.Rptr.2d 384, italics added.) In addition to a statement or act by the decedent unequivocally evincing the decedent's intent to adopt, the claimant must show the decedent acted consistently with that intent by forming with the claimant a close and enduring familial relationship.[6] That is, in addition to a contract or other direct evidence of the intent to adopt, the evidence must show "objective conduct indicating mutual recognition of an adoptive parent and child relationship to such an extent that in equity and good conscience an adoption should be deemed to have taken place." (Estate of Bauer, supra, 111 Cal.App.3d at p. 560, 168 Cal.Rptr. 743.)

II. Standard of Proof of Equitable Adoption
Bean also contends the lower courts erred in applying a standard of clear and convincing proof to the equitable adoption question. We disagree. Most courts that have considered the question require at least clear and convincing evidence in order to prove an equitable adoption. (See Clark, The Law of Domestic Relations in the United States, supra, at p. 927; Rein, supra, 37 Vand. L.Rev. at p. 780.)[7] Several good reasons support the rule.
*550 First, the claimant in an equitable adoption case is seeking inheritance outside the ordinary statutory course of intestate succession and without the formalities required by the adoption statutes. As the claim's "strength lies in inherent justice" (Wooley v. Shell Petroleum Corporation, supra, 45 P.2d at p. 932), the need in justice for this "extraordinary equitable intervention" (Rein, supra, 37 Vand. L.Rev. at p. 785) should appear clearly and unequivocally from the facts.
Second, the claim involves a relationship with persons who have died and who can, therefore, no longer testify to their intent. As with an alleged contract to make a will (see Crail v. Blakely (1973) 8 Cal.3d 744, 750, fn. 3, 106 Cal.Rptr. 187, 505 P.2d 1027), the law, in order to guard against fraudulent claims, should require more than a bare preponderance of evidence. Where "the lips of the alleged adopter have been sealed by death ... proof of the facts essential to invoke the intervention of equity should be clear, unequivocal and convincing." (Cavanaugh v. Davis (1951) 149 Tex. 573, 235 S.W.2d 972, 978.)
Finally, too relaxed a standard could create the danger that "a person could not help out a needy child without having a de facto adoption foisted upon him after death." (Rein, supra, 37 Vand. L.Rev. at p. 782.) As pointed out in an early Missouri decision, if the evidentiary burden is lowered too far, "then couples, childless or not, will be reluctant to take into their homes orphan children, and for the welfare of such children, as well as for other reasons, the rule should be kept and observed. No one, after he or she has passed on, should be adjudged to have adopted a child unless the evidence is clear, cogent, and convincing...." (Benjamin v. Cronan (1936) 338 Mo. 1177, 93 S.W.2d 975, 981.)
Evidence Code section 115 provides that the burden of proof in civil cases is a preponderance of the evidence "[e]xcept as otherwise provided by law." The law providing for a higher standard of proof may include decisional law. (Weiner v. Fleischman (1991) 54 Cal.3d 476, 483, 286 Cal.Rptr. 40, 816 P.2d 892.) Persuaded by the reasoning of sister-state decisions and commentary, we hold that in order to take as an equitably adopted child from the alleged adoptive parent's intestate estate, the claimant must prove the decedent's intent to adopt by clear and convincing evidence.

CONCLUSION
Although the evidence showed the Fords and Bean enjoyed a close and enduring familial relationship, evidence was totally lacking that the Fords ever made an attempt to adopt Bean or promised or stated their intent to do so; they neither held Bean out to the world as their natural or adopted child (Bean, for example, did not take the Ford name) nor represented to Bean that he was their child. Mrs. Ford's single statement to Barbara Carter was not clear and convincing evidence that Mr. Ford intended Bean to be, or be treated as, his adopted son. Substantial evidence thus supported the trial court, which heard the testimony live and could best assess its credibility and strength, in its finding that intent to adopt, and therefore Bean's claim of equitable adoption, was unproven.

*551 DISPOSITION
The judgment of the Court of Appeal is affirmed.
WE CONCUR: GEORGE, C.J., KENNARD, BAXTER, CHIN, BROWN, and MORENO, JJ.
NOTES
[1] All further statutory references are to the Probate Code unless otherwise specified.
[2] In California, at least, adoption itself is "purely statutory in origin and nature." (Estate of Radovich (1957) 48 Cal.2d 116, 128, 308 P.2d 14 (dis. opn. of Schauer, J.).) The effect of an equitable adoption finding, therefore, is limited to the child's inheritance rights and does not in other respects equate the child's rights with those of a statutorily adopted child.
[3] Much more recently, the Court of Appeal held an equitably adopted child was not "issue" of the adoptive parent as that term was used in a grandparent's will. (Estate of Furia (2002) 103 Cal.App.4th 1, 126 Cal.Rptr.2d 384.) We have no occasion here to decide whether that decision and Estate of Grace conflict or which is correct if they do.
[4] The difficulty of applying ordinary contract law to equitable adoption has also been recognized by commentators and by courts in other states. (See, e.g., Wooley v. Shell Petroleum Corporation, supra, 45 P.2d at p. 932 ["The weakness of this class of cases, considered as resting upon a valid enforceable contract, is readily apparent.... Its strength lies in inherent justice"]; Clark, The Law of Domestic Relations in the United States, supra, at p. 926 [specific performance rationale "does some violence to concepts of contract"]; Rein, Relatives by Blood, Adoption, and Association: Who Should Get What and Why (1984) 37 Vand. L.Rev. 711, 772-775 (hereafter Rein) [noting that adoption contract would ordinarily not be binding without approval of state agency or court, that contract cannot be literally enforced after decedent's death because "[a] corpse cannot adopt anyone," and that the idea of contract between adoptive parents and child is suspect because "the child is usually too young when he enters the foster home to know of any contract or to understand its import if he did know of it"].)
[5] See, e.g., Calista Corp. v. Mann (Alaska 1977) 564 P.2d 53, 61; Holloway v. Jones (Mo.1922) 246 S.W. 587, 591; Mize v. Sims (Mo.Ct.App.1974) 516 S.W.2d 561, 564, 566; Wooley v. Shell Petroleum Corporation, supra, 45 P.2d at page 932 (New Mexico); Cubley v. Barbee (1934) 123 Tex. 411, 73 S.W.2d 72, 78-79; Jones v. Guy (1940) 135 Tex. 398, 143 S.W.2d 906, 907-909. Recent Texas decisions have relaxed or excused proof of the reliance element of equitable estoppel in this context. (See Spiers v. Maples (Tex.Ct.App.1998) 970 S.W.2d 166, 171; Luna v. Estate of Rodriguez (Tex.Ct.App.1995) 906 S.W.2d 576, 581; Ramsay v. Lane (Tex.Ct.App.1974) 507 S.W.2d 905, 907.)
[6] A close familial relationship sufficient to support the decedent's intent to adopt must persist up to, or at least not be repudiated by the decedent before, the decedent's death.
[7] California appellate decisions are not to the contrary, though the issue has not until now been squarely decided in the intestate succession context. Two courts upholding findings of equitable adoption in that context assumed, without needing to decide, that the standard is one of clear and convincing evidence. (Estate of Wilson, supra, 111 Cal.App.3d at p. 248, 168 Cal.Rptr. 533; Estate of Rivolo, supra, 194 Cal.App.2d at p. 777, 15 Cal.Rptr. 268.) The court in Estate of Bauer, supra, 111 Cal.App.3d at page 561, 168 Cal.Rptr. 743, an inheritance tax case, applied that same standard in reversing an equitable adoption finding. The federal court in Mingo v. Heckler, supra, held the clear and convincing standard inapplicable, for purposes of a Social Security benefits decision, where the alleged adoptive parent was still alive and available to testify. (745 F.2d at p. 538, fn. 3.) We consider the issue here only in the context of intestate succession from the adoptive parent.