*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-PR-463

IN RE ESTATE OF ROSA NORTH FORD;

RAYMOND NORTH-BEY, APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(ADM-1014-16)

(Hon. Alfred S. Irving Jr., Trial Judge)

(Argued November 8, 2018            Decided January 31, 2019)

*Kate Heinzelman* for appellant.

*Joyce A. Williams* for intervenor.

Before BLACKBURNE-RIGSBY, *Chief Judge*, EASTERLY, *Associate Judge*, and WASHINGTON, *Senior Judge*.

EASTERLY, *Associate Judge*: In this case, we consider whether an individual who is neither the biological nor legally adopted child of a decedent may equitably claim to be the decedent's "child" and "heir" under the District's intestacy statutes such that he has standing as an "interested person" to probate the decedent's estate. We hold that an individual may claim equitable status as a decedent's child, but

only in the strictly limited circumstance where he proves by clear and convincing evidence that the decedent took him in as a minor and, from that time on, objectively and subjectively stood in the shoes of his parent. We endorse a fact-specific, equitable inquiry specific to probate matters.

## I.   Facts and Procedural History[1]

Rosa North Ford died intestate in 1998. Her estate was not probated at that time. Ms. North Ford had no biological offspring,[2] but she raised several children in her home, among them:  Ms. Dorothy Lenoir (née North), the eldest, Mr. Michael S. North, and Mr. Raymond North-Bey, about five and ten years Ms. Lenoir's junior, respectively. Mr. North is Mr. North-Bey's biological brother; they came to live with Ms. North Ford in the mid 1950s when Mr. North was five and Mr. North-Bey was only a few months old. Ms. North Ford obtained a Social

---

[1]  An evidentiary hearing to resolve any disputed issues of fact has never been held in this case. In the absence of such a hearing or findings of fact subsequent thereto, we assume the truth of the facts proffered to the trial court.

[2]  The addition of "Ford" to Ms. North Ford's surname suggests that she may have been have been married at one time, but the record is silent as to any marriage and reflects that she did not have a spouse or domestic partner when she died. Ms. North Ford had siblings (all of whom were deceased by the time of Ms. Lenoir's petition) and a number of nieces and nephews ("the collateral heirs").

Security card for Mr. North-Bey bearing the surname "North"[3] (not his birth surname) and she enrolled him in school. According to Mr. North-Bey's counsel, "[h]e lived his life believing and understanding himself to be the adopted child of Rosa North," and Ms. North Ford held herself out as his mother. In 2006, Mr. North-Bey returned to live in the house he had grown up in, thinking that he had inherited the property.

In 2016, Ms. Lenoir, then age seventy-one and in declining health, filed a petition to probate Ms. North Ford's estate, in which she identified herself, Mr. North, and Mr. North-Bey as Ms. North Ford's "adopted" children, "heirs at law," and thus "interested persons" under D.C. Code § 20-101 (2012 Repl.) with standing to initiate probate proceedings. Ms. Lenoir's particular interest was to ensure that Ms. North Ford's home in northeast Washington, the estate's only asset, was not sold.[4] Ms. Lenoir acknowledged that Mr. North-Bey, then age sixty, had been living in the property "during the past several years" and that he was the current occupant.

---

[3] As reflected on his driver's license, Mr. North-Bey subsequently changed his surname from "North" to "North-Bey" for religious reasons.

[4] By this time the house was subject to a tax sale foreclosure proceeding. Ms. Lenoir asked the court to appoint her counsel as the personal representative of the estate to participate in that litigation.

Ms. Lenoir subsequently withdrew from the litigation of the probate matter after informing the court that she had reason to believe that Ms. North Ford had not legally adopted her—or Mr. North or Mr. North-Bey. In response, Mr. North-Bey filed a motion asking the court to appoint a personal representative for Ms. North Ford's estate to protect the estate's sole asset, the house where Ms. North Ford had raised him and where he was living. Mr. North-Bey also asked the court to recognize "his right to inherit as an adopted child of Rosa North Ford" and thus his status as "an Interested Person pursuant to D.C. Code § 20-101(d)(1)." After his effort to locate records of his adoption in D.C. Superior Court proved unsuccessful, Mr. North-Bey filed a supplemental motion asking the court to recognize his right "to inherit as an adopted or equitably-adopted child" of Ms. North Ford.

Mr. North-Bey did not concede that he was not legally adopted by Ms. North Ford and, at a second status hearing, he questioned whether the Superior Court's records from the 1950s were "entirely reliable." But even if the Superior Court's lack of records were deemed to prove that he was not legally adopted by Ms. North Ford, Mr. North-Bey argued that the court should recognize his status as an heir by virtue of the doctrine of equitable adoption. Mr. North-Bey acknowledged that the District of Columbia Court of Appeals had never addressed this doctrine, but explained that it was recognized in the intestacy context in "a majority of

jurisdictions," including Maryland. Mr. North-Bey further acknowledged that, if the trial court recognized the doctrine of equitable adoption, its application to his case would trigger a "fact-based inquiry that requires an evidentiary hearing." He asked the court to give him "adequate time to complete his investigation and to prepare for an evidentiary hearing regarding his claim of equitable adoption."

Without further court proceedings, the trial court issued an order denying Mr. North-Bey's motion for a personal representative. The court explained that, under District law, only an interested person may file a petition with the court to open an estate. Mr. North-Bey's only claim to be an interested person was his putative status as an heir, but the court determined he was neither Ms. North Ford's biological nor her "formally adopt[ed]" child. The court further ruled that "[t]his jurisdiction does not recognize equitable adoption[]." The court acknowledged that the Court of Appeals "has not addressed this issue[]," but reasoned that adoption is a "statutory construct" in the District and that "neither the Congress nor the Council has signaled by way of amendment [of the adoption statute] that anything other than a final decree of adoption can create rights that a natural born child would have."[5] Ultimately the court determined it "should not depart from

---

[5] The court noted that two other Superior Court judges had previously ruled likewise, in *In re Estate of Wooden*, 1997 ADM 462 (D.C. Super. Ct. Oct. 21, (continued…)

[the] current status of the law in this jurisdiction," and it did "not view the common law evolution for which Mr. North-Bey advocates to be within its province."

"[W]ithout the benefit of equitable adoption," the trial court determined that Mr. North-Bey could not show that he was an heir to Ms. North Ford's estate and was "without standing to petition the Court to open the estate for probate." The court thus denied Mr. North-Bey's motion for the appointment of a personal representative and dismissed the probate case.

After Mr. North-Bey timely appealed the trial court's decision and order, Ms. North Ford's collateral heirs, see *supra* note 2, filed a petition to probate her estate. *See In re Rosa North Ford*, No. 2017 ADM 001134 (D.C. Super. Ct. filed Sept. 19, 2017). The court appointed a personal representative, Mr. Joseph C. Lomax Jr., for the estate. The second probate case has been stayed pending this appeal, in which Mr. Lomax has intervened.

---

(…continued)
1998), and *In re Estate of Lucas*, No. 2003 ADM 1327 (D.C. Super. Ct. March 23, 2003).

## II. Standard of Review

Whether Mr. North-Bey has standing as an interested person to litigate a probate case, and the embedded question of whether the District of Columbia recognizes the doctrine of equitable adoption such that Mr. North-Bey could be deemed Ms. North Ford's child and heir under the intestacy statute, are questions of law that we review de novo. *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 705 (D.C. 2009) ("[S]tanding is a question of law which we consider on appeal *de novo*." (quotation marks omitted)); *Lewis v. Washington Hosp. Ctr.*, 77 A.3d 378, 379–80 (D.C. 2013) ("[T]he proper interpretation of statutory provisions is a question of law that we resolve de novo.").

## III.    Analysis

Under the D.C. Code, only certain individuals or entities may initiate probate proceedings "to resolve a question or controversy" in the administration of an estate:  "interested person[s], the beneficiary of a trust, or the Register [of

Wills].["6] D.C. Code § 20-107 (a) (2012 Repl.). An "interested person" is defined to include, *inter alia*, "an heir," D.C. Code § 20-101 (d)(1)(D), which in turn is defined as a person entitled "pursuant to Chapter 3 of Title 19" to the property of "an intestate decedent."[7] D.C. Code § 20-101 (c). Chapter 3 of Title 19 sets forth a "course of descents" whereby the law presumes, in the absence of a will, to whom a decedent would have chosen to distribute her property. In the distribution hierarchy, "children" are at the top, second only to the decedent's spouse. *See* D.C. Code §§ 19-301, 302, 306. But the probate statutes do not expressly define who may claim status as the decedent's "child."

By arguing that this court should grant him equitable relief, Mr. North-Bey implicitly concedes that the term "children" in the probate statutes does not apply to him if he was not legally adopted.[8] Although we agree with this concession, we pause to explain our reasoning. "[I]t is axiomatic that the words of a statute should

---

[6] The Register of Wills is a court officer whose duties are statutorily defined and encompass filing probate petitions in certain circumstances. D.C. Code § 20-321; § 11-2104.

[7] An "intestate decedent" is someone who died without a valid will expressing her wishes for the distribution of her real and personal property. D.C. Code § 20-101 (e).

[8] As Mr. North-Bey acknowledges, there is no room for equitable relief where complete and adequate legal relief is available. *Kakaes v. George Washington Univ.*, 790 A.2d 581, 583 (D.C. 2002).

be construed according to their ordinary sense and with the meaning commonly attributed to them." *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc) (quotation marks omitted). In common parlance, the term "child" plainly encompasses an individual's genetic offspring. *See, e.g.*, *Merriam-Webster New International Dictionary* (3d ed. 2002) ("[A] male or female descendant in the first degree: the immediate progeny of human parents"). In addition, as explained below, for over half a century the D.C. Code has recognized that an equal parent-child relationship is formed by legal adoption. We conclude that this enduring understanding that a "child" is either the genetic offspring or the legally-adopted progeny of the parent controls in the probate context.

In 1963, Congress passed the "Judiciary and Judicial Procedure" Act. Pub. L. No. 88-241, 77 Stat. 478.[9] The Act accepted as foundational "the relationship of natural parent and natural child," i.e. the bond between parent and genetic offspring. D.C. Code § 16-312 (a); *see also* § 16-302 (explaining a "natural parent" need not join his or her spouse's petition to adopt his or her child); § 16-304 (c) (explaining "minority of a natural parent" does not obviate his or her

---

[9] For purposes of this paragraph only, citations to the D.C. Code refer to the Code as it was enacted in 1963.

consent to the child's adoption); § 16-304 (b)(1), (2)(C), (D) (explaining consent to a proposed adoption is required, *inter alia*, "from the mother . . . of a prospective adoptee born out of wedlock"); *cf.* § 16-2347 (authorizing blood tests to disprove paternity). The Act then made coequal the parent-child relationship formed by legal adoption:

> A final decree of adoption establishes the relationship of natural parent and natural child between adopter and adoptee *for all purposes*, including mutual rights of inheritance and succession as if adoptee were born to adopter. The adoptee takes from, through, and as a representative of his adoptive parent or parents in the same manner as a child by birth, and upon the death of an adoptee intestate, his property shall pass and be distributed in the same manner as if the adoptee had been born to the adopting parent or parents in lawful wedlock.[10]

D.C. Code § 16-312 (a) (emphasis added);[11] *see also* § 16-313 (explaining that "[i]n the District, 'child' or its equivalent in a deed, grant, will or other written instrument [presumptively] includes an adopted person").

Two years later, and against this backdrop, Congress passed the District's intestacy statue, Decedents' Estates and Fiduciary Relations, Pub. L. No. 89-183,

---

[10] The statute retained common law notions of legitimacy, but these were subsequently discarded in 1977 with the passage of "District of Columbia Marriage and Divorce Act." D.C. Law 1-107 § 105 (1977) (codified at D.C. Code § 16-908 (1981)).

[11] D.C. Code § 16-312 (a) remains unchanged from the 1963 version. *Compare* § 16-312 (a) (1963) *with* § 16-312 (a) (2012 Repl.).

79 Stat. 685 (1965), which in pertinent part remains unchanged today and directs, *inter alia*, that real and personal property of a decedent who dies intestate shall be distributed, pursuant to the course of descents, to the decedent's "children." D.C. Code §§ 19-301, 19-306; *see also* § 19-311. We presume Congress understood the term "children" in the intestacy statute to possess the meaning it already bore elsewhere in the Code. *See, e.g.*, *Farina v. Nokia Inc.*, 625 F.3d 97, 112 (3d Cir. 2010) ("Congress is presumed to enact legislation with knowledge of the law and a newly-enacted statute is presumed to be harmonious with existing law[.]" (quotation marks omitted)); *cf. Richman Towers Tenants' Ass'n, Inc. v. Richman Towers LLC*, 17 A.3d 590, 611–12 (D.C. 2011) (explaining that, particularly in the absence of any legislative debate, it is fair to interpret the TOPA statute in manner that is consistent with other pre-existing laws protecting tenants). This reasoning seems especially appropriate given that rights of inheritance by adopted children are expressly addressed in D.C. Code § 16-312, the provision best reflecting Congress's understanding that the parent-child relationship may be formed genetically or by final adoption decrees.

Having determined that the term "child" in the intestacy statute is unambiguous and does not apply to Mr. North-Bey if he was not legally adopted, we turn to consider his argument that, as a matter of equity, he should be deemed

to stand in the shoes of a "child" under the intestacy statute. In addressing this argument, the trial court's dominant and legitimate concern was that the District's intestacy statutes are the final word on intestate succession and foreclose equitable relief. In particular, the trial court highlighted the fact that a number of states have determined that their intestacy statutes foreclose the application of equity in this context.[12]

We agree with the trial court that the District's intestacy and adoption statutes would seem to bar Mr. North-Bey's claim. But there is one other statute that must be considered: D.C. Code § 45-401 (a) (2012 Repl.).[13] Section 45-401 (a) provides that "the principles of equity . . . remain in force except insofar as the same are inconsistent with . . . some provision of the 1901 Code." Applying the principles of equity is not inconsistent with the District's intestacy statute; to the contrary, such application would seem to enhance its inherently equitable function.

---

[12] As Mr. North-Bey acknowledges, a minority of state courts have considered and rejected as a matter of law that an individual may be deemed a decedent's "child" as a matter of equity in the intestacy context, but the split is close, with twenty-seven in favor and twenty against.

[13] Mr. North-Bey cited this statute in his brief to this court, but did not cite it in his pleadings to the trial court.

The intestacy statute ensures that, in the absence of a valid will, the District does not simply take possession of all the decedent's property. Instead, consistent with the general recognition that "society prefers to keep real property within the family as most broadly defined," 27A Am. Jur. 2d Escheat § 12 (2018 ed.),[14] the intestacy statute presumes that a decedent—even though she did not take the requisite steps to make her desires legally binding—would have wanted her property to be distributed to her family. The hierarchy of succession set forth in the intestacy statute is meant to approximate the distributional choices we expect most decedents would make within a family structure. *See In re Estate of Ford*, 82 P.3d 747, 753 (Cal. 2004) ("The law of intestate succession is intended to carry out the intent a decedent without a will is most likely to have had." (internal quotation marks omitted)). We see no inconsistency between presuming that (1) as a matter of statute, a decedent would have wanted individuals related to her genetically or by means of legal adoption to inherit her property in the absence of a valid will, and (2) as a matter of equity, a decedent would have wanted an individual not genetically related or legally adopted but in all respects functionally her child to be considered an heir under our intestacy statute. To the contrary, in such cases, the

---

[14] *See also District of Columbia v. Estate of Parsons*, 590 A.2d 133, 138 (D.C. 1991) (explaining that "escheats are not favored by the law" and "any doubt whether property is subject to escheat is resolved against the state" (internal quotation marks omitted)).

statutory and equitable objectives to ensure fairness and fulfill societal expectations are the same. In short, we hold that, in limited circumstances, an individual who is not a child within the meaning of the intestacy statute may nonetheless claim status as the decedent's child and heir pursuant to § 45-401 as a matter of equity.[15]

As noted, see *supra* note 12, other jurisdictions have similarly held that their intestacy statutes do not foreclose equitable relief and have endorsed what some call the "doctrine of equitable adoption." Although we add ourselves to this group, we are wary of recognizing such a "doctrine" for at least two reasons. First, the question before us has nothing to do with adoption,[16] which is a distinct legal event

---

[15] Because this case does not require us to do so, we do not address whether an individual who stands in the shoes of a decedent's child may inherit "through" the decedent to reach the estates of the decedent's other heirs, *but see, e.g.*, *Bd. of Educ. Of Montgomery Cty. v. Browning*, 635 A.2d 373, 378–80 (Md. 1994) (declining to expand equitable adoption to permit inheritance "through," rather than from, the decedent and referring to other jurisdictions holding the same), or whether status as "heir" flows in the opposite direction from minor child to equitable "parent," *but see, e.g.*, *Heien v. Crabtree*, 369 S.W.2d 28, 30–31 (Tex. 1963) (rejecting that the doctrine of equitable adoption can be applied to allow putative adoptive parents to inherit from a decedent-child who died intestate).

[16] *See* 2 Am. Jur. 2d Adoption § 63 (2018 ed.) (acknowledging that what many states label "equitable adoption" is a misnomer as it "is not intended or applied to create the legal relationship of parent and child, nor is it meant to create a legal adoption" (footnotes omitted)).

under the D.C. Code, generally concerning the long-term welfare of a minor.[17] Our distinct task in this case is to determine who possesses standing as an interested person to initiate a probate matter, which requires us to identify who possesses the right to inherit from an intestate decedent, i.e., who may materially benefit from an intestate decedent's estate.

Second, we resist elevating our application of equitable principles to "doctrine" where we can discern no widely agreed upon animating principle, much less an established test, and we are unpersuaded of the utility of some of the disparate criteria endorsed by other states. As Mr. North-Bey acknowledges, states that recognize "equitable adoption" in intestate succession cases espouse roughly three different rationales, and the criteria they set out for proving equitable status as the decedent's "child" vary accordingly.

Some states ground their theory of "equitable adoption" in principles of implied contract and specific performance. *See, e.g.*, *Bd. of Educ. of Montgomery Cty. v. Browning*, 635 A.2d 373, 376–77 (Md. 1994); *Calista Corp. v. Mann*, 564 P.2d 53, 62 (Alaska 1977); *Barlow v. Barlow*, 463 P.2d 305, 309 (Colo. 1969). *But*

---

[17] *But see* D.C. Code § 16-303 (2012 Repl.) (authorizing the adoption of adults as well as children).

*see Wheeling Dollar Sav. & Tr. Co. v. Singer*, 250 S.E.2d 369, 374 (W. Va. 1978) (rejecting "an implied contract of adoption [a]s an unnecessary fiction"). These states require an individual claiming "child" status to prove the existence of an unperformed contract or agreement to adopt. But this diverts the inquiry from discerning to whom the decedent would have wanted to distribute her property to examining whether a contract was formed. We are uncertain of the logic underpinning this formalistic focus. Indeed, one could argue that evidence of an unratified agreement to adopt cuts against a claim for equitable status as the decedent's "child," as it could suggest that the decedent at one point intended to make the child a permanent family member, but then changed her mind.

Other states rely on principles of equitable estoppel, *see, e.g.*, *In re Painter's Estate*, 67 N.W.2d 617, 619 (Iowa 1954), which generally requires a showing of detrimental reliance, *see Cassidy v. Owen*, 533 A.2d 253, 255 (D.C. 1987). But it seems unlikely that a putative child, particularly one taken in by the decedent as an infant, would have altered his behavior or performance depending on whether he expected to inherit; and, in any event, absent proof of a promise to devise property to the putative child, the child arguably has no equitable interest in inheriting. Rather, as described, the equitable interest is in ensuring that the decedent's wishes regarding the disposition of her property are realized.

A third group of states more generally seeks to promote fairness and to honor the intent of the decedent to treat a child as if the child were the decedent's own. *See, e.g.*, *In re Ford*, 82 P.3d at 754; *DeHart v. DeHart*, 986 N.E.2d 85, 103 (Ill. 2013); *Wheeling Dollar Sav. & Tr. Co.*, 250 S.E.2d at 372, 373. We align ourselves with these states' focus on the decedent's intent[18] and examination of whether the claimant was functionally the decedent's child.[19] This approach, however, appears to be less the stuff of distinct doctrine and more the traditional practice of considering what is equitable in light of the particular facts of the case.

---

[18] We acknowledge that even these states provide somewhat mixed messages regarding the nature of the decedent's intent. For example, in *Ford*, the California Supreme Court states both that an equitable adoption claimant "must demonstrate the existence of some direct expression, on the decedent's part, of an *intent to adopt the claimant*" and also that a claimant can carry his burden by presenting "proof of other acts or statements directly showing that the decedent *intended the child to be, or to be treated as, a legally adopted child*." 82 P.3d at 754 (emphasis added); *id.* at 753 (explaining that "[t]he existence of a mutually affectionate relationship, without any direct expression by the decedent of an intent to adopt the child or to have him or her treated as a legally adopted child, sheds little light on the decedent's likely intent regarding distribution of property"). We endorse the latter articulation of the decedent's intent.

[19] *See DeHart*, 986 N.E.2d at 101 (holding that an individual seeking to inherit under a theory of equitable adoption must "prove . . . that his status is identical to that of a formally adopted child, except only for the absence of a formal order of adoption"); *Wheeling Dollar Sav. & Tr. Co.*, 250 S.E.2d at 373 (holding that an individual seeking to inherit as an "equitably adopted child" must prove "that he has stood from an age of tender years in a position [e]xactly equivalent to a formally adopted child" (emphasis omitted)).

With this exposition of our thinking, we conclude that if an individual seeks to establish that he is an intestate decedent's child and heir as a matter of equity, he must prove that the decedent objectively and subjectively stood in the shoes of his parent. At a minimum, the putative child must prove that, as a minor, the decedent gave him a permanent home. Further, the court should consider the particular facts regarding the nature of the decedent's relationship with the putative child, including but not limited to whether the decedent cared for the putative child (i.e., took charge of his health, education, and general welfare) until he reached the age of majority, as a parent would; whether the putative child was incorporated into the decedent's broader family; whether the decedent gave the putative child her surname; and whether the decedent held herself out to others in the community as a parent to the putative child. The court may also consider whether the putative child continued to maintain a relationship with his biological family and if so, if that relationship was inconsistent with the decedent assuming the role of parent to the putative child.

We intentionally set a high substantive bar—one that we anticipate will be difficult if not impossible for individuals younger than Mr. North-Bey to surpass. Our highly-regulated foster care and adoption systems now leave little room for

doubt about the creation—or not—of a parent-child relationship. But we cannot say that this has always been the case in the District of Columbia. Certainly, the facts proffered by Mr. North-Bey to the trial court suggest a very different era, where parent-child relationships could have formed extralegally. And it is these proffered facts that persuade us that the identification of an intestate decedent's child and heir under the District's intestacy statutes may be subject to equitable interpretation.

We further hold that an individual who seeks to establish that he was functionally the decedent's child under the intestacy statute must support his claim by clear and convincing evidence.[20] "Most courts that have considered the question" require such a showing. *In re Ford*, 82 P.3d at 754 (citing HOMER H. CLARK, THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 20.9) (2d ed.

---

[20] We are unpersuaded by Mr. North-Bey's argument (made for the first time at oral argument) that we should endorse the preponderance of the evidence standard to resolve paternity claims, as discussed in *In re Estate of Glover*, 470 A.2d 743 (D.C. 1983). This standard was derived from a (now-amended) statute, *see id*. at 749 (citing D.C. Code § 16-909 (a) (1977) (amended 2008)). Here, we do not have the directive of a statute, nor are we confronted with a question, like paternity, that can be definitively resolved (these days, with relative ease, by genetic testing). Instead, we are authorizing trial courts to make an equitable judgment call. Given that "the claim's strength lies in inherent justice, the need in justice for this extraordinary equitable intervention should appear clearly and unequivocally from the facts." *Ford*, 82 P.3d at 754–55 (internal quotation marks and citations omitted).

1987); *see also, e.g.*, *DeHart*, 986 N.E.2d at 104; *Lankford v. Wright*, 489 S.E.2d 604, 607 (N.C. 1997). A higher burden of proof is appropriate because the claimant "is seeking inheritance outside the ordinary statutory course of intestate succession and without the formalities" of legal adoption, *id.* at 755, with the result that others within the statutorily-defined course of descents could receive a lesser or no share of the decedent's estate. Relatedly, we must realistically guard against the possibility of fraud, which is heightened when "the claim involves a relationship with persons who have died and who can, therefore, no longer testify to their intent." *Id.*; *cf. Uckele v. Jewett*, 642 A.2d 119, 123 (D.C. 1994) (explaining that an individual seeking to prove receipt of an inter vivos gift after the putative donor has died must do so by clear and convincing evidence).

## IV. Conclusion

For the reasons set forth above, we reverse the trial court's ruling that Mr. North-Bey did not have standing to initiate a proceeding to probate Ms. North Ford's estate. We remand this case to the trial court for a hearing at which Mr. North-Bey may present evidence in support of his claim that he is Ms. North

Ford's child and heir as a matter of equity[21] and thus establish his standing to litigate this probate matter.[22]

*So ordered.*

---

[21] Of course, if Mr. North-Bey has discovered evidence that he was in fact legally adopted, he may present that evidence as well.

[22] We reject as unsupported by the record Mr. Lomax's arguments either that Mr. North-Bey never requested a hearing or that the trial court assessed Mr. North-Bey's evidence and found it insufficient.