<u>In Re: The Estate of Michael Gerard Schappell</u>, No. 15, September Term, 2024

**INTESTATE SUCCESSION – EQUITABLE ADOPTION – INTENT TO ADOPT –** Supreme Court of Maryland held that claimant may establish right to inherit from intestate decedent, who died with no surviving spouse, registered domestic partner, surviving issue, parents, siblings, or grandparents, under doctrine of equitable adoption upon satisfying by clear and convincing evidence two-step test demonstrating proof of decedent's intent to adopt and that decedent acted in accord with that intent. First, person claiming equitable adoption must demonstrate proof of decedent's intent to adopt by establishing existence of expression, on decedent's part, of intent to adopt claimant. This intent may be shown by proof of unperformed express agreement or promise to adopt. It may also be demonstrated by proof of other acts or statements showing that decedent intended claimant to be, or to be treated as, legally adopted child, such as proof of invalid or unconsummated attempt to adopt or decedent's statement of intent to adopt child. Second, claimant must demonstrate that decedent manifested to public or community at large that claimant was decedent's natural or legally adopted child and decedent treated claimant as decedent's natural or legally adopted child.

Supreme Court reversed judgment of Appellate Court of Maryland and remanded case to that Court with instruction to remand case to Orphans' Court for Montgomery County for determination of Petition to Transmit Issues and Demand for Jury Trial, which was filed by stepdaughter of decedent, based on standard set forth in opinion.

Orphans' Court for Montgomery County
Estate No. W108952

Argued: October 7, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 15

September Term, 2024

_____

IN RE: THE ESTATE OF MICHAEL
GERARD SCHAPPELL

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Opinion by Watts, J.

_____

Filed: February 11, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In Maryland, adoption and inheritance are governed by statutes. Under Maryland law, if a person dies without a will, under a hierarchy of succession set forth by statute, stepchildren do not share in the decedent's estate if the decedent is survived by any biological relatives or formally adopted children. See Md. Code Ann., Est. & Trusts (1974, 2022 Repl. Vol., 2024 Supp.) ("ET") §§ 1-205(b), 1-209, 3-103, 3-104(c).[1] This, however, may not be the end of the inquiry.

When an individual dies without a will, a person may claim an inheritance right to the decedent's estate based on the theory that the decedent equitably, though not legally, adopted the person. This has sometimes been called a claim of "adoption by estoppel," "virtual adoption," "de facto adoption," or a claim under the doctrine of equitable adoption. Bd. of Educ. of Montgomery Cnty. v. Browning, 333 Md. 281, 287, 635 A.2d 373, 376 (1994) (citations omitted). If the claim is successful, the claimant may be allowed to inherit without having undergone a formal statutory adoption procedure. Although the scope and parameters of the doctrine of equitable adoption have not been clearly defined by our case law, Maryland is among the jurisdictions that have recognized the principle. Currently, though, the requirements for establishing equitable adoption are neither completely clear in Maryland nor uniformly applied in other jurisdictions.

In this case, we must determine the requirements for establishing equitable adoption where a decedent died intestate and an adult stepchild who was not legally adopted claimed

---

[1]Maryland's statutory adoption requirements for adoptions without prior termination of parental rights are set forth at Md. Code Ann., Fam. Law (1984, 2019 Repl. Vol., 2024 Supp.) §§ 5-331 to 5-342.

a sole inheritance right under the doctrine. Our case law and that from other jurisdictions suggests three non-exclusive methods for establishing equitable adoption. The first method is contract based and involves an inquiry into whether the decedent and claimant entered into a contract for which there should be specific performance. The second method relies on principles of equitable estoppel and concerns, in part, whether a claimant has relied on a relationship with the decedent. The third method is intent based and looks to whether a decedent had the intent to adopt. See, e.g., Est. of Ford, 82 P.3d 747, 754 (Cal. 2004); In re Est. of North Ford, 200 A.3d 1207, 1214 (D.C. 2019). All three approaches require proof by clear and convincing evidence.

In this case, Michael Gerard Schappell (the "Decedent") died intestate in 2021, leaving no close relatives as he had no spouse or domestic partner, siblings, or biological or legally adopted children, and his parents and grandparents had predeceased him. The Decedent had a stepdaughter, Karen Ellis, Respondent, whom he had known since he married Ms. Ellis's mother when Ms. Ellis was four years old. Ms. Ellis petitioned the Orphans' Court for Montgomery County to be named, under the doctrine of equitable adoption, the sole heir to the Decedent's estate. Ms. Ellis petitioned for the transmission of issues[2] to the Circuit Court for Montgomery County for a jury to determine whether she

---

[2]ET § 2-105(b)(1) provides that, "[a]t the request of an interested person made within the time determined by the [orphans'] court, the issue of fact may be determined by a court of law." ET § 2-105(b)(2) provides that, "[w]hen the request is made before the [orphans'] court has determined the issue of fact, the court shall transmit the issue to a court of law." See also Md. R. 6-434 ("Transmitting Issues"). This Court has stated that "'[t]o aid in the execution of that duty, the Legislature has empowered the [orphans'] court to direct any issue of fact to be tried by plenary proceedings and with the help of a jury.'"

- 2 -

had been equitably adopted by the Decedent.

Karen Schappell Daniel, Paul Schappell, and Anne O'Boyle Vlahos, Petitioners, who are or were intestate heirs of the Decedent, filed in the orphans' court a motion for summary judgment on the issues raised by Ms. Ellis.[3]  Ms. Daniel, a cousin of the Decedent, had been named the personal representative of the Decedent's estate and moved for summary judgment individually and in that capacity.  Petitioners sought summary judgment in their favor on the ground that Ms. Ellis could not be named the heir because the Decedent never intended to adopt Ms. Ellis and, as such, the doctrine of equitable adoption did not apply.  Petitioners also opposed the request to transmit issues to the circuit court.  The orphans' court denied without prejudice Petitioners' motion for summary judgment, granted the petition to transmit issues, and issued an order transmitting seven issues (questions) to the circuit court for decision.  Petitioners appealed.

The Appellate Court of Maryland held that "if a person seeks to establish that they are an intestate decedent's equitable child and heir, the person must prove that they and the decedent, objectively and subjectively, intended to and did live as child and parent."  In re Est. of Schappell, 260 Md. App. 532, 559, 310 A.3d 1181, 1196 (App. Ct. Md. 2024).  The Appellate Court concluded that a claimant must prove that the decedent intended to treat the claimant as the decedent's own child and that the intent element is not necessarily an intent to adopt pursuant to the adoption statute, but rather an intent that the child be

Shealer v. Straka, 459 Md. 68, 82, 184 A.3d 391, 399 (2018) (quoting Ades v. Norins, 204 Md. 267, 272, 103 A.2d 842, 844 (1954)).

[3]On brief, Petitioners advise that Ms. Vlahos "participated in the proceedings below and joined in Petitioners' Petition for Certiorari[,]" but has since passed away.

- 3 -

regarded and treated as a natural or legally adopted child. See id. at 559, 310 A.3d at 1196-97.

The Appellate Court determined that applying the doctrine of equitable adoption involves a mixed question of fact and law and that the orphans' court did not err in transmitting one of the seven questions to the circuit court, which the Appellate Court described as a mixed question of fact and law concerning whether Ms. Ellis had been equitably adopted by the Decedent. See id. at 563-64, 310 A.3d at 1199. The Appellate Court concluded that the other six questions should not have been transmitted to the circuit court because they were questions of fact and it is the orphans' court's responsibility to determine the facts of a case, and that, in this instance, the first-level facts were not in dispute. See id. The Appellate Court vacated the orphans' court's order and remanded the case to the orphans' court for proceedings consistent with its opinion. See id. at 564, 310 A.3d at 1199-1200.

In this Court, Petitioners contend that, in Maryland, under the doctrine of equitable adoption, a claimant must prove by clear and convincing evidence the existence of an unfulfilled contract, promise, or agreement by the decedent to adopt the claimant, and that, if the claimant satisfies that burden, the claimant may be considered a formally adopted child and heir for purposes of intestate succession. Petitioners assert that the Appellate Court of Maryland adopted a test for the doctrine of equitable adoption that focuses on overall fairness rather than a contract-based approach in contravention of this Court's case law concerning the doctrine. Petitioners maintain that this Court should reject the test adopted by the Appellate Court and continue to require proof of an agreement to adopt, or

at a minimum an expression of an intent to adopt, as an element of the doctrine of equitable adoption.

Ms. Ellis contends that the Appellate Court correctly recognized that the focus of a court's inquiry as to equitable adoption should not be solely on whether there was an unconsummated contract to adopt, but rather should rest on whether, under the totality of the circumstances, the decedent objectively and subjectively intended to and did live as child and parent with the claimant. Ms. Ellis argues that the Appellate Court's conclusion that the intent that must be shown is an intent that the child be regarded and treated the same as a natural or legally adopted child and not an intent to statutorily or legally adopt the child promotes both the purpose of equitable adoption and Maryland's intestacy statutes. Ms. Ellis asserts that proof of an express contract is not and should not be a prerequisite to establish an equitable adoption. Ms. Ellis requests that this Court affirm the judgment of the Appellate Court and remand the case to the orphans' court for a trier of fact to determine whether the Decedent equitably adopted her.

After careful review of our case law concerning equitable adoption and that of other jurisdictions, we find instructive the standard set forth by the Supreme Court of California in Ford, 82 P.3d at 752, 754, which held that a claimant alleging equitable adoption must prove by clear and convincing evidence the decedent's intent to adopt the claimant by

> demonstrat[ing] the existence of some direct expression, on the decedent's part, of an intent to adopt the claimant. This intent may be shown, of course, by proof of an unperformed express agreement or promise to adopt. But it may also be demonstrated by proof of other acts or statements directly showing that the decedent intended the child to be, or to be treated as, a legally adopted child, such as an invalid or unconsummated attempt to adopt, the decedent's statement of his or her intent to adopt the child, or the

decedent's representation to the claimant or to the community at large that the claimant was the decedent's natural or legally adopted child.

Differing somewhat from the standard established by Supreme Court of California in Ford, for reasons explained below, we conclude that a claimant seeking to establish equitable adoption must demonstrate a decedent's intent to adopt under a two-step test, which requires proof of both the decedent's intent to adopt the claimant and that the decedent acted in accordance with the intent. We hold that where a decedent dies intestate, leaving no surviving spouse or registered domestic partner, biological or legally adopted children, parents, siblings, or grandparents, a person claiming equitable adoption must, first, by clear and convincing evidence, demonstrate proof of the decedent's intent to adopt the person, which may be established by proof of a "direct expression, on the decedent's part, of an intent to adopt the claimant[,]" such as "an unperformed express agreement or promise to adopt."[4] Id. at 754 (citations omitted). The requisite intent may also be shown by "proof of other acts or statements directly showing that the decedent intended the [claimant] to be, or to be treated as, a legally adopted child, such as an invalid or unconsummated attempt to adopt[ or] the decedent's statement of [an] intent to adopt the child[.]" Id. (citations omitted). Second, a claimant must demonstrate by clear and

---

[4]Our holding is limited to the circumstance of this case—namely, a decedent who dies intestate with no surviving relatives in greater priority under Maryland's intestate succession law than Petitioners, who identify themselves as "aunts, uncles, cousins, and other intestate heirs[,]" (footnote omitted), some of whom could claim inheritance under ET § 3-104(b)(1)(iii) or (b)(2)(iii) as the issue of the Decedent's grandparents. We leave for another day the question of whether the test for equitable adoption should be the same or different where an intestate decedent dies with surviving relatives such as a spouse, registered domestic partner, issue, or others who would inherit under ET §§ 3-102, 3-103, 3-104(a), 3-104(b)(1)(i) and (ii), and 3-104(b)(2)(i) and (b)(2)(ii).

- 6 -

convincing evidence that the decedent acted in accordance with the intent to adopt by manifesting to the public or community at large that the claimant was considered to be the decedent's natural or legally adopted child and treating the claimant as the decedent's natural or legally adopted child.  See id.

Although our holding stems largely from the Supreme Court of California's in Ford, unlike the Supreme Court of California, we do not conclude that a decedent representing to the claimant or to the public or community at large that the claimant was considered or treated as a natural or adoptive child is sufficient alone to demonstrate the decedent's intent to adopt the claimant.  This results from recognition that a decedent may have held out to a claimant or to the public or the community at large that a claimant was considered to be or treated as a natural or adoptive child but have had no intent either to adopt the claimant or for the claimant to inherit.

We reverse the judgment of the Appellate Court of Maryland and remand the case to that Court with instruction to remand the case to the Orphans' Court for Montgomery County for a determination of the Petition to Transmit Issues and Demand for Jury Trial filed by Ms. Ellis based on the standard set forth in this opinion.

**BACKGROUND**

The following facts are derived from filings of the parties and orders issued in this case by the Orphans' Court for Montgomery County.

On May 29, 2021, the Decedent died intestate.  In 1979, the Decedent had married Carol A. Schappell.  Mrs. Schappell's biological daughter, Ms. Ellis, was four years old when the marriage occurred.  Ms. Ellis lived with her biological father, Kenneth Klenk,

until she was fourteen years old, at which point she split her time between Mr. Klenk's and the Schappells' homes until reaching the age of majority. Mr. Klenk is currently alive. Mrs. Schappell died in 2019. The Decedent never remarried, had no biological children or siblings, and both his parents and grandparents predeceased him. The Decedent is survived by aunts and uncles, as well as the children of deceased aunts and uncles.

Ms. Ellis alleges that she and the Decedent had a father-daughter relationship. According to Ms. Ellis, the Decedent was very involved with her education and molded her character during her formative years. Ms. Ellis alleges that the Decedent attended her graduations, her wedding, and her children's baptisms, and that her husband asked the Decedent for permission to marry her. Ms. Ellis states that the Decedent referred to her as his daughter when introducing her, and the Decedent referred to her children as his grandchildren and her husband as his son-in-law. Ms. Ellis alleges that the Decedent gave his vehicle to her husband and wrote in a letter to a bank that he needed a payoff letter so he could move forward with giving the vehicle "to [his] son-in-law." In the bill of sale for the vehicle, the Decedent stated that he was giving the vehicle, "as a gift, to [his] son-in-law[.]"

Ms. Ellis states that when the Decedent's father died, the Decedent wrote in the obituary that his father was survived by a granddaughter, Ms. Ellis. According to Ms. Ellis, she assisted the Decedent with filing an insurance claim following a fire in the Decedent's home and remained the point of contact with the insurance adjuster after the Decedent's death. Ms. Ellis alleges that when the Decedent was hospitalized in 2020, she and her husband traveled to Maryland from their home in North Carolina to take care of the

Decedent's home and his dog. Ms. Ellis states that she made all of the Decedent's funeral arrangements and paid for the funeral.

Ms. Ellis advises that when Mrs. Schappell died, her entire estate passed to her husband, the Decedent, as everything she owned was jointly held with the Decedent or the Decedent was named the primary beneficiary. Ms. Ellis asserts that, during the span of her relationship with the Decedent, he would make statements to Ms. Ellis such as "when we're gone, all of this will be yours" or "one day, all of this will be yours[.]" Ms. Ellis recalls that the Decedent mentioned his desire to have an estate plan prepared after Mrs. Schappell's death, but Ms. Ellis was unaware of whether the Decedent actually did so. According to Ms. Ellis, the Decedent requested her Social Security number so that he could name her as the beneficiary of his life insurance policy.

On November 24, 2021, Ms. Ellis petitioned the orphans' court for a determination that she was the Decedent's sole heir pursuant to the doctrine of equitable adoption. On December 22, 2021, the orphans' court denied the petition. Ms. Ellis filed a motion for reconsideration and/or to alter, amend, or revise the order, indicating her belief that when she filed the petition, the matter would be held pending the discovery of all interested persons and provision of notice to them. Ms. Ellis requested that the orphans' court reissue its order to reflect that the petition was denied without prejudice so she could refile once any interested persons were identified. The orphans' court did so. On April 29, 2022, Ms. Ellis refiled the petition.

On May 13, 2022, Ms. Daniel was appointed Personal Representative of the Decedent's estate, effective May 17, 2022. On May 24, 2022, Petitioners filed a petition

to dismiss Ms. Ellis's petition for determination of heir. The orphans' court denied the petition to dismiss. On August 29, 2022, Petitioners filed a petition for summary judgment. On September 12, 2022, Ms. Ellis filed a petition in the orphans' court, seeking to transmit issues of fact to the circuit court to be tried by a jury. Ms. Ellis requested that the following three questions be transmitted to the circuit court for trial by jury:

a. Did [the Decedent] promise Karen Ellis that she would be entitled to receive his estate?
b. Did Karen Ellis faithfully and fully perform the duties of a natural child to [the Decedent]?
c. Is Karen Ellis the equitably adopted child of [the Decedent]?

On October 7, 2022, the orphans' court held a hearing on the two pending matters—Petitioners' petition for summary judgment and Ms. Ellis's petition to transmit issues of fact to the circuit court for a jury trial. At the conclusion of the hearing, the orphans' court determined that it would transmit what it described as a mixed question of law and fact to the circuit court, namely, the issue concerning whether Ms. Ellis was equitably adopted. The orphans' court also determined that six additional questions of fact should be transmitted to the circuit court. In doing so, the orphans' court explained that, in its view, there were disputes of material fact at the time of the hearing but that if the circuit court determined otherwise, it could grant summary judgment. The orphans' court denied without prejudice Petitioners' request for summary judgment.

On January 6, 2023, the orphans' court issued a written order transmitting the following seven issues to the circuit court for trial by jury:

1. Was there some sort of an arrangement between [the Decedent] and Karen Ellis that would give rise to an implication of an intention by [the Decedent] to equitably adopt Karen Ellis?

- 10 -

2. Was there performance of that arrangement on the part of Karen Ellis?
3. Did [the Decedent] receive all the benefits and privileges accruing from such performance by Karen Ellis?
4. By their arrangement was Karen Ellis induced to perform under the belief that she occupied the status of an adopted child of [the Decedent]?
5. Was there a promise by [the Decedent] to Karen Ellis that she would be treated as an adoptive child?
6. Was there an express promise that Karen Ellis would be entitled to receive [the Decedent's] estate?
7. Is Karen Ellis the equitably adopted child of [the Decedent]?

On January 17, 2023, Petitioners filed a notice of appeal.

**Opinion of the Appellate Court of Maryland**

On February 28, 2024, in a reported opinion, the Appellate Court of Maryland vacated the orphans' court's order and remanded the case to the orphans' court for action consistent with its opinion. See Schappell, 260 Md. App. at 564, 310 A.3d at 1199-1200. The Appellate Court discussed the doctrine of equitable adoption as it has been applied in other jurisdictions and the status of Maryland case law on the issue. See id. at 545-55, 310 A.3d at 1188-94. The Appellate Court stated that the rationale underlying the application of doctrine of equitable adoption could be grouped into three "camps." Id. at 547, 310 A.3d at 1189 (citation omitted). The Appellate Court described the first camp as those jurisdictions that apply the doctrine of equitable adoption through principles of implied contract and specific performance. See id. at 547-48, 310 A.3d at 1189. The Appellate Court described the second camp as jurisdictions that rely on equitable estoppel principles when applying the doctrine and explained that estoppel principles may apply where putative adoptive parents have received the benefits and privileges of a child treating them as parents and they (the adoptive parents) "by their representations induced such

- 11 -

performance under the belief of the existence of the status of [the] adopted child." Id. at 548, 310 A.3d at 1190 (cleaned up). The Appellate Court described the third camp as following the "current trend" of promoting fairness by honoring the decedent's intent. Id. at 548, 310 A.3d at 1190. According to the Appellate Court, this approach requires a court to "analyze[] a set of factors aimed at discerning the decedent's intent, subjectively and objectively, to treat the child the same as a natural or adopted child along with other relevant circumstances demonstrating a close and enduring familial relationship." Id. at 549, 310 A.3d at 1190 (citations omitted).

Adopting an intent-based approach, the Appellate Court concluded:

[I]f a person seeks to establish that they are an intestate decedent's equitable child and heir, the person must prove that they and the decedent, objectively and subjectively, intended to and did live as child and parent. We stress from the outset that it is insufficient merely to prove that a close familial relationship existed between the decedent and the putative child.
    Rather, a putative child claiming equitable adoption must prove that the decedent intended to treat them as the decedent's own child and that the child was "functionally," as the District of Columbia Court of Appeals put it, the decedent's child. *See North Ford*, 200 A.3d at 1214. The intent element is not necessarily an intent to *statutorily* adopt. Rather, the intent is that the child be regarded and treated the same as a natural or legally adopted child. In the context of intestate succession, this intent may be proved by the totality of the circumstances, including evidence that the decedent represented to both the child and the world that the child was the decedent's child and by evidence demonstrating that intent.

Schappell, 260 Md. App. at 559, 310 A.3d at 1196-97. The Appellate Court explained that this approach recognizes the wide variability of stepparent/stepchild relationships and allows for the courts to reach the "right result[.]" Id. at 560, 310 A.3d at 1197. The Appellate Court stated that, in determining the intent of a decedent and "assessing whether the decedent and putative child functioned as a parent and natural or adopted child would

- 12 -

function," a court should consider "all relevant circumstances related to the relationship between the decedent and the putative child[,]" and that "a putative child must prove an equitable adoption claim by clear and convincing evidence." Id. at 561-62, 310 A.3d at 1197-98.

The Appellate Court concluded that, based on the record, the only issue that could be transmitted to the circuit court was issue 7, whether Ms. Ellis was equitably adopted, which it described as a mixed question of fact and law. See id. at 563, 310 A.3d at 1199. The Appellate Court concluded that the other six issues are factual in nature and that the "first-level facts are not in dispute." Id. at 563-64, 310 A.3d at 1199.[5]

## Petition for a Writ of *Certiorari*

On April 11, 2024, Petitioners filed a petition for a writ of *certiorari*, raising the following issue:

> Did the Appellate Court of Maryland err by rejecting Maryland's longstanding requirement of an agreement to adopt as an element of equitable adoption, instead replacing it with a case-by-case examination of "fairness" factors?

---

[5]The Appellate Court noted that the orphans' court's order transferring issues to the circuit court ordered a trial by jury but the Appellate Court indicated that matters involving equitable relief are ordinarily not triable by jury. See Schappell, 260 Md. App. at 564, 310 A.3d at 1199. Because the parties had not briefed the issue, however, the Appellate Court stated that it would not express an opinion as to whether "any fact issues are triable by a jury as distinguished from a judge." Id. at 564, 310 A.3d at 1199. The Appellate Court, therefore, refrained from addressing the question it perceived as to whether the orphans' court's order of trial by jury on the issues transmitted was appropriate. See id. at 564, 310 A.3d at 1199.

In addition, the Appellate Court concluded that the orphans' court did not err in denying Petitioners' motion for summary judgment. See id. at 563, 310 A.3d at 1199. The Appellate Court explained that the orphans' court had discretion to deny the motion for summary judgment and, even if the motion could have been granted, the denial was not reversible error. See id. at 563, 310 A.3d at 1199.

- 13 -

On June 17, 2024, we granted the petition. See In re Est. of Schappell, 487 Md. 263, 317 A.3d 912 (2024).

**Standard of Review**

"It is well settled that the findings of fact of an Orphans' Court are entitled to a presumption of correctness[, but] that interpretations of law by such courts are not entitled to the same presumption of correctness on review: the appellate court must apply the law as it understands it to be." Pfeufer v. Cyphers, 397 Md. 643, 648, 919 A.2d 641, 644 (2007) (cleaned up). "Where a case involves the application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are 'legally correct' under a de novo standard of review." Clancy v. King, 405 Md. 541, 554, 954 A.2d 1092, 1099 (2008) (cleaned up).

**DISCUSSION**

**A. Maryland's Intestacy Statute**

When a decedent dies intestate, *i.e.*, without a will, the decedent's estate is distributed according to Title 3 ("Intestate Succession and Statutory Shares") of the Estates and Trusts Article of the Maryland Code, ET §§ 3-101 to 3-413. Under ET § 3-104(c), when the decedent has no surviving blood relatives, a stepchild is entitled to inherit, if the stepchild's parent was not divorced from the decedent. Stepchildren, however, are explicitly excluded from the definition of child. See ET § 1-205(b) ("A child does not include a stepchild[.]"). If a decedent dies intestate and has a surviving spouse or domestic partner, surviving issue, or surviving blood relatives, there is no statutory provision in

Maryland under which a stepchild can inherit.

## B. Equitable Adoption

Under the doctrine of equitable adoption, a parent-child relationship may be recognized by a court in the absence of a formal legal adoption. See, e.g., Ford, 82 P.3d at 750. Application of the doctrine varies greatly from jurisdiction to jurisdiction. As the Appellate Court observed, a minority of jurisdictions do not recognize equitable adoption at all, with some courts concluding that application of equitable principles of adoption would conflict with an intestacy statute or that the statutory method of adoption is exclusive. See Schappell, 260 Md. App. at 545-46, 310 A.3d at 1188 (citing Wilks v. Langley, 451 S.W.2d 209, 213 (Ark. 1970); Smith v. Atl. Coast Line R. Co., 47 S.E.2d 725, 727 (S.C. 1948)). At the other end of the continuum, the Supreme Court of Appeals of West Virginia has held that an equitably adopted child has the same status as a statutorily adopted child for all purposes, not just intestate inheritance. See Wheeling Dollar Sav. & Tr. Co. v. Singer, 250 S.E.2d 369, 373 (W. Va. 1978); see also First Nat'l Bank In Fairmont v. Phillips, 344 S.E.2d 201, 204 (W. Va. 1985) ("*Singer* . . . expressly holds that the statutory adoption procedure is not the exclusive method of obtaining adoptive *status*.").

Although its approach and scope have not been clearly defined in our case law, this Court has recognized the doctrine of equitable adoption. See McGarvey v. State, 311 Md. 233, 234, 533 A.2d 690, 690-91 (1987). In discussing the doctrine of equitable adoption, however, we have not identified specific criteria for its establishment but have made clear that the scope of the doctrine is limited. See id. at 240-42, 533 A.3d at 693-94. We have not endorsed as broad an approach as that of the Supreme Court of Appeals of West

- 15 -

Virginia, as we have specifically declined to take the position that equitable adoption and statutory adoption are the same for all purposes. See id. at 240, 533 A.2d at 694 ("[W]e are surely not prepared to go as far as West Virginia has gone."). In applying the doctrine of equitable adoption, courts in most jurisdictions have either concluded that a particular holding concerning equitable adoption is limited to the specific context in which the doctrine is being applied or have not addressed expanding the doctrine outside of the context of the specific case. See, e.g., North Ford, 200 A.3d at 1213 & n.15; DeHart v. DeHart, 986 N.E.2d 85, 103-04 (Ill. 2013); Ford, 82 P.3d at 754; Calista Corp. v. Mann, 564 P.2d 53, 61-62 & n.21 (Alaska 1977).

In terms of the requirements for establishing equitable adoption, three approaches have emerged. First, there are jurisdictions that apply principles of contract and specific performance. See, e.g., Calista Corp., 564 P.2d at 62; Barlow v. Barlow, 463 P.2d 305, 308-09 (Colo. 1969). Under the specific performance theory, a claimant must generally show that there was a contract or an agreement to adopt, and both parties performed in accordance with the contract. See Browning, 333 Md. at 288, 635 A.2d at 377 ("[C]ourts enforce the promise of the adoptive parent provided that sufficient consideration is given in return for the promise of adoption."). Next, there are jurisdictions that apply the principle of equitable estoppel. See, e.g., In re Painter's Est., 67 N.W.2d 617, 618-19 (Iowa 1954); Jones v. Guy, 143 S.W.2d 906, 908 (Tex. 1940). Under the equitable estoppel theory, a claimant must prove reliance on the parent-child relationship and that it would be against principles of equity for a claim of inheritance to be denied. See Browning, 333 Md. at 288, 635 A.2d at 377. Finally, there are jurisdictions that look to the decedent's

intent to adopt and will determine that equitable adoption has been established where a decedent's intent to adopt a claimant is established.  See, e.g., North Ford, 200 A.3d at 1214; DeHart, 986 N.E.2d at 103; Ford, 82 P.3d at 754.  As the term equitable adoption implies, the approaches, while different, are all grounded in principles of fairness and equity.

### C. Maryland Case Law on Equitable Adoption

Both this Court and the Appellate Court have had occasion to consider issues involving equitable adoption but neither court has announced a definitive standard or test for applying the doctrine.

### Clayton v.  Supreme Conclave, Improved Ord. of Heptasophs

In Clayton v. Supreme Conclave, Improved Ord. of Heptasophs, 130 Md. 31, 32-33, 35, 37, 99 A. 949, 950-51 (1917), where the decedent was a member of a fraternal organization or "mutual order" and had the organization issue a certificate identifying two children, who had not been legally adopted by him, as beneficiaries of an endowment that he had paid into, this Court upheld the decedent's designation of the beneficiaries on principles involving equitable adoption.  After the decedent passed away, the organization refused to make payment, contending that only biological or legally adopted children could be beneficiaries.  See id. at 33-34, 99 A. at 950-51.  In upholding the designation of beneficiary, we observed that the decedent had taken the two children in at a young age after their parents died and had reared the children as if they were his own.  See id. at 33, 99 A. at 950.  The children were his niece and nephew.  See id. at 33, 99 A. at 950.  At the time, there was no statute governing the matter that provided for a "legal adoption."  Id. at

35, 99 A. at 951.

In concluding that the designation of beneficiary was valid, we seemingly relied on both principles of contract and equitable estoppel. See id. at 34-37, 99 A. at 950-52. On one hand, we suggested that equitable adoption is grounded in principles of contract and specific performance by observing that cases from other jurisdictions

> generally establish the proposition that a parol obligation by a person to adopt the child of another as his own, accompanied by the virtual, though not statutory, adoption, and acted upon by both parties during the obligor's life, may be enforced upon the death of the obligor, who dies without disposing of the property by his will; nor is such a contract rendered invalid by statutory provisions requiring the execution of wills to be in writing.

Id. at 36-37, 99 A. at 952 (citations omitted). On the other hand, we stated that the decedent made the beneficiary designation over two decades before his death and that the organization had accepted his payments the entire time without questioning the designation. See id. at 33-34, 99 A. at 950-51. This observation suggests that the matter was decided, in part, on principles of estoppel and reliance, although the reliance at issue involved the relationship between the decedent and the organization rather than the decedent and the children.

**Besche v. Murphy**

In Besche v. Murphy, 190 Md. 539, 541, 552, 59 A.2d 499, 500, 505 (1948), where a residuary clause in a decedent's will provided that the remainder of the estate would go to "those persons who under the laws of the State of Maryland would take in case of intestacy[,]" this Court held that the claimant, who lost her parents at a young age and had been cared for by the decedent, could not inherit the residuary estate under the will as an

equitably adopted child because the decedent did not die intestate.  We concluded that a reasonable interpretation of the will's residuary clause was that the decedent intended the statutory intestacy laws of Maryland to apply, which do not provide for an equitably adopted child to inherit.  See id. at 541, 550, 552, 59 A.2d at 500, 504-05.

In reaching this conclusion, we noted that courts in other jurisdictions have concluded that a non-consummated agreement or contract to adopt is subject to enforcement as to the right of inheritance.  See id. at 547-48, 59 A.2d at 503-04.  We stated that case law from other jurisdictions showed that "there must be an agreement to adopt," and that the agreement can be oral and can be established based on conduct.  Id. at 548, 59 A.2d at 504.  We stated, however, that the claimant could not have brought a claim for specific performance against the decedent during the decedent's lifetime because "[t]here would have been no mutuality of remedy to enforce such a contract" and services performed by a child would be involved.  Id. at 543, 59 A.2d at 501.  We noted that, in Maryland, "adoption is not a contract alone between the parties.  It requires judicial determination of the advisability of permitting such action[.]"  Id. at 544, 59 A.2d at 501.  And, "[e]quity will not ordinarily enforce a contract to create such relationship[.]"  Id. at 544, 59 A.2d at 502 (citation omitted).

**McGarvey v. State**

In McGarvey, 311 Md. at 234, 533 A.2d at 690, in addressing whether the doctrine of equitable adoption exists in Maryland and, if so, whether applying the doctrine would result in a reduction of inheritance taxes assessed against an equitably adopted person, this Court recognized the doctrine of equitable adoption for purposes of intestate succession,

but held that the doctrine "does not affect the rate of inheritance tax charged to an equitably adopted person." In McGarvey, id. at 235, 533 A.2d at 691, the child's natural parents and the decedent, who was the child's aunt, agreed that the decedent would adopt the child, and the decedent raised the child, but "never got around" to completing the formal adoption process. The decedent died and named the child as the sole legatee under her will. See id. at 235, 533 A.2d at 691. The decedent's legacy was considerable, and a substantial inheritance tax was assessed based on the 10% rate imposed on collateral descendants and not the 1% rate applicable to direct lineal descendants. See id. at 235, 533 A.2d at 691. The child asserted that he had been equitably adopted by the decedent and sought a refund, which was denied. See id. at 235, 533 A.2d at 691.

We described the doctrine of equitable adoption as follows:

[T]he doctrine in general involves the notion that if an individual who is legally competent to adopt a child enters into a contract to do so, and if the contract is supported by consideration in the form of part performance that falls short of completion of statutory adoption, then a court, applying equitable principles, may accord to the child the status of a formally adopted child for certain limited purposes.

Id. at 234, 533 A.2d at 690-91. We explained that the discussion of equitable adoption in Besche suggested that we "looked with favor on the doctrine, at least to the extent that it would be applied to allow an equitably adopted child to take a distributive share of the equitably adoptive parent's estate on intestacy[,]" even though, in Besche, we did not apply the doctrine because intestacy was not involved. McGarvey, 311 Md. at 237, 533 A.2d at 692. We concluded that the fairness of applying the doctrine of equitable adoption in the intestacy context, "once the prerequisite facts have been established by clear and

convincing evidence, is apparent[, a]nd that application of the doctrine fits well within the traditional contractual and equitable estoppel notions that have been advanced to support it." Id. at 238, 533 A.2d at 692-93.

As to the question of whether an equitably adopted child was subject to the inheritance tax rate imposed on collateral or lineal descendants, we explained that, based on statutory language governing inheritance tax, "children" includes only "formally adopted children." Id. at 241-43, 533 A.2d at 694-95. Although we determined that "the factual basis for application of the doctrine [of equitable adoption] exists in this case" and was not in dispute, we concluded that the doctrine would be of no benefit to the claimant for purposes of the applicable inheritance tax rate, given that the claimant had not been formally adopted by the decedent. Id. at 235, 238, 243, 533 A.2d at 691, 693, 695.

**Board of Educ. of Montgomery Cnty. v. Browning**

In Browning, 333 Md. at 286, 293, 635 A.2d at 376, 379-80, we considered whether an equitably adopted child could inherit from her adoptive mother's sister, *i.e.*, the child's aunt, and concluded that, even if the claimant had been equitably adopted, the claimant could not inherit from her adoptive mother's sister. We declined to expand the scope of the doctrine of equitable adoption to include an equitably adopted child inheriting through an adopted parent. See id. at 293, 635 A.2d at 379-80. We described the elements of equitable adoption as follows:

> [S]ome showing of an agreement between the natural and adoptive parents, performance by the natural parents of the child in giving up custody, performance by the child by living in the home of the adoptive parents, partial performance by the foster parents in taking the child into the home and treating the child as their child, and the intestacy of the foster parent.

Id. at 287 n.3, 635 A.2d at 377 n.3 (cleaned up). We stated that the basis for the doctrine of equitable adoption, "which permits a child to share in the estate of [a] deceased parent who had agreed to adopt the child, is that it is inequitable and unjust to allow the parent to escape the obligations of an adoptive parent by failing to comply with the agreement." Id. at 287-88, 635 A.2d at 377 (citation omitted).

We explained that in prior cases the doctrine of equitable adoption had been discussed under two different theories—specific performance of a contract to adopt and estoppel whereby "the personal representative of the estate of the adoptive parent is estopped from asserting that the child was not an adopted child." Id. at 288, 635 A.2d at 377. We concluded that it was not important which theory was used because application of the doctrine of equitable adoption is the same under either theory, as courts "focus upon the equities involved and require clear and convincing evidence of the adoption contract." Id. at 288, 635 A.2d at 377 (cleaned up). After describing the doctrine of equitable adoption, we stated in no uncertain terms that Maryland recognizes the doctrine "as it applies to an equitably adopted child who seeks to inherit by intestate succession from the estate of an equitably adoptive parent." Id. at 289, 635 A.2d at 378 (citing McGarvey, 311 Md. at 238-39, 533 A.2d at 692-93).

As to whether an equitably adopted child can inherit through, as opposed to from, an equitably adoptive parent, after reviewing case law from other jurisdictions, we concluded that "a majority of jurisdictions do not permit equitably adopted children to inherit from the kindred of their adoptive parents." Id. at 293, 635 A.2d at 379. We agreed

with those jurisdictions, explaining that, "[u]nder both contractual and estoppel notions, the equities that clearly exist in favor of permitting an equitably adopted child to inherit from an equitably adoptive parent do not exist when that child seeks to inherit from a sibling of the child's adoptive parents." Id. at 293, 635 A.2d at 380.

## Geramifar v. Geramifar

In Geramifar v. Geramifar, 113 Md. App. 495, 500-01, 504, 688 A.2d 475, 477, 479 (1997), the Appellate Court of Maryland considered "whether the doctrine of equitable adoption is an appropriate vehicle for compelling an adoptive parent to pay child support[,]" and concluded that because both the appellant and appellee had equitably adopted the child, the appellee had a duty to contribute to the child's support. In Geramifar, id. at 497, 688 A.2d at 476, the appellant and appellee married in 1976 but were unable to have children. In 1993, after the couple decided to adopt a child of Iranian heritage, an Iranian court granted the couple guardianship of an infant boy named Ashkan. See id. at 498, 688 A.2d at 476. At the end of 1993, the couple separated before having started formal adoption proceedings in the United States. See id. at 498, 688 A.2d at 476. After a custody dispute began, the appellee abandoned his quest for custody or visitation, waived his right to adopt Ashkan, and claimed he had no duty to provide child support. See id. at 499, 688 A.2d at 476-77. The trial court concluded that the appellee did not have a duty to support Ashkan. See id. at 499, 688 A.2d at 477.

After describing the doctrine of equitable adoption, which the Appellate Court noted "is a more specific doctrine than is the doctrine of equitable estoppel[,]" and reviewing the facts of the case, the Appellate Court concluded that the parties had entered into a contract

to adopt Ashkan and that the case was "a textbook example of equitable adoption." Id. at 500-501 & n.3, 688 A.2d at 477-78 & n.3. The Appellate Court held that the parties' agreement terminating the appellee's request for custody and visitation did not terminate the appellee's support obligation. See id. at 504, 688 A.2d at 479. The Appellate Court stated that, "once it was established that appellee was Ashkan's equitably adoptive parent, his obligations could be terminated only by order of the court." Id. at 503, 688 A.2d at 478.

## D. Case Law of Other Jurisdictions

Although there is no bright line separating them, case law from other jurisdictions concerning the doctrine of equitable adoption generally falls into three categories: (1) "contract-based," (2) "equitable estoppel," and (3) "intent-to-adopt" approaches.[6]

### Contract-Based Jurisdictions

In Calista Corp., 564 P.2d at 54-55, 61-62, the Supreme Court of Alaska, as a matter of first impression, recognized the doctrine of equitable adoption as "an appropriate vehicle

---

[6]Jurisdictions that require both evidence of an agreement to adopt and reliance on the agreement or performance of the agreement are discussed in the estoppel section of the discussion below to the extent that they rely on the theory that an estate is estopped from disputing an equitable adoption.

In their brief, Petitioners categorize the case law from other jurisdictions by referring to "agreement-based jurisdictions," "intent-to-adopt jurisdictions," and "fairness test jurisdictions," and assert that the Appellate Court adopted a "fairness test" or "flexible fairness approach." This is not entirely accurate. Although the Appellate Court emphasized the fairness of its approach, the Court adopted an intent-based approach that linked the requisite intent to an intent to treat a child as a natural or adopted child. See Schappell, 260 Md. App. at 559, 310 A.3d at 1196-97. The Appellate Court concluded that an intent to treat or regard a child like a natural or legally adopted child demonstrated by the totality of the circumstances is sufficient to establish equitable adoption. See id. at 559, 310 A.3d at 1196-97.

which can be utilized in intestate succession cases to avoid hardship created in part by the diversity of cultures found within this jurisdiction." (Footnote omitted). The Supreme Court observed that of the many jurisdictions that recognized equitable adoption, two basic approaches were used—the specific performance theory, where there is an oral or written promise to adopt, and the estoppel theory, under which a person is estopped from asserting a child was not adopted where the person voluntarily assumed the status of parent. See id. at 60-61. The Supreme Court concluded that it had the power to recognize the doctrine of equitable adoption "within the probate context" and identified five elements to be considered in determining whether an equitable adoption has been established:

> (1) the foster parents must have died intestate; (2) there must have been a contract or agreement to adopt, either express or implied from the surrounding facts; (3) the foster parents must have represented to the child, either expressly or by their conduct, that he or she was adopted, thereby inducing the child, to the extent that his or her age permitted, to perform duties expected; (4) the child, to the extent that his or her age permitted, must have carried out his or her filial obligations in the belief that he or she was an adopted child; and (5) any steps taken by the foster parents to legally adopt the child must not have been perfected.

Id. at 61-62 (footnotes omitted).[7]

In Barlow, 463 P.2d at 308-09, the Supreme Court of Colorado observed that although the doctrine of equitable adoption had been called different names, in Colorado, it means "a situation involving an oral contract to adopt a child, fully performed except that there was no statutory adoption, and in which the rule is applied for the benefit of the child

---

[7]The Supreme Court stated that, given evidentiary issues of proof as to the third and fourth elements, establishing those two elements is not mandatory. Calista Corp., 564 P.2d at 62 n.22.

in the determination of heirship upon the death of the person contracting to adopt." In Herrera v. Glau, 772 P.2d 682, 684 (Colo. App. 1989), in holding that an equitably adopted child is an heir for purposes of intestate succession but not for purposes of having standing to initiate a wrongful death action, the Colorado Court of Appeals, Div. V, reiterated the statement in Barlow that an equitable adoption in Colorado exists where there is an oral contract to adopt.

In Sanders v. Riley, 770 S.E.2d 570, 573-74 (Ga. 2015), the Supreme Court of Georgia stated that virtual adoption has been recognized in Georgia for over a hundred years as an equitable remedy

> applied only after the death of the person who agreed to adopt the child . . . and when there has been no legal (statutory) adoption. The child, who is often an adult by that time, is allowed to invoke the doctrine of virtual adoption to avoid an unfair result from the application of intestacy statutes.

(Cleaned up). The Supreme Court stated that, where an equitable remedy is sought based on an oral contract to adopt, "proof of such contract must be made out so clearly, strongly and satisfactorily as to leave no reasonable doubt as to the agreement." Id. at 574 (cleaned up). In that circumstance, the parties need not "use the word 'adopt' or any other technical term in their agreement." Id. (citation omitted). Rather, the focus is on "the nature of the[ parties'] intended and agreed upon provision for the child in question which controls." Id. (citation omitted). The Supreme Court stated that, in addition to proof of an agreement to adopt, "there must be clear and convincing proof of partial performance by the parties to the agreement," with the biological parent severing or interrupting their relationship with the child and the adopting parent caring for the child as their own. Id. (citations omitted).

**Equitable Estoppel Jurisdictions**

In Wheeling, 250 S.E.2d at 373-74, the Supreme Court of Appeals of West Virginia declined to hold that an express or implied contract to adopt was necessary to establish an equitable adoption. The Supreme Court held that an equitably adopted child "in any private property dispute such as the case under consideration involving the laws of Inheritance or Private trusts must prove by clear, cogent and convincing evidence that he has stood from an age of tender years in a position Exactly equivalent to a formally adopted child." Id. at 373 (footnote omitted). The Supreme Court stated that circumstances that tend to show the existence of an equitable adoption include the following: (1) "the benefits of love and affection accruing to the adopting party"; (2) "the performances of services by the child"; (3) "the surrender of ties by the natural parent"; (4) "the society, companionship and filial obedience of the child"; (5) "an invalid or ineffectual adoption proceeding"; (6) "reliance by the adopted person upon the existence of his adoptive status"; (7) "the representation to all the world that the child is a natural or adopted child"; and (8) "the rearing of the child from an age of tender years by the adopting parents." Id. at 373-74 (citations omitted). The Supreme Court concluded that when a claimant can "prove sufficient facts to convince the trier of fact that his status is identical to that of a formally adopted child, except only for the absence of a formal order of adoption, a finding of an equitable adoption is proper without proof of an adoption contract." Id. at 374. The Supreme Court explained that it could not "ascertain any reasonable distinction between a child treated in all regards as an adopted child but who has been led to rely to his detriment upon the existence of formal

legal paperwork imagined but never accomplished, and a formally adopted child."[8] Id. at 373. The Supreme Court indicated that proof of equitable adoption was akin to establishing the existence of a legal adoption, *i.e.*, a parent-child relationship, for all purposes. See id. ("[T]he only remaining question . . . is whether adherence to formal adoption procedures . . . is the exclusive method by which a person may be accorded the protections of adoptive status in West Virginia. We find that it is not."); id. ("An equitably adopted child in practical terms is as much a family member as a formally adopted child and should not be the subject of discrimination.").

In Painter's Est., 67 N.W.2d at 618, the Supreme Court of Iowa stated that Iowa recognizes that certain property rights may be attained under the theory of adoption by estoppel. The Supreme Court explained that rights of inheritance can be acquired only by strict compliance with the statutory adoption process and that, even if there is an agreement to adopt, which was not executed in compliance with the statutes and which conferred property rights, any rights attained are from the contract and not through the inheritance statutes. See id. According to the Supreme Court, under the theory of adoption by estoppel, the requirements of the adoption statutes were to be construed

> liberally, in order to carry out the intention of the parties and to protect the interests of a child who has been the subject of an attempted adoption and who has in every way complied with the adoption agreement and fulfilled the duties of an adopted child, as against collateral heirs whose only claim to the property of the adopting parents is that of blood relationship.

---

[8]In North Ford, 200 A.3d at 1214, based on Wheeling, the District of Columbia Court of Appeals described West Virginia as a jurisdiction that focuses on promoting fairness and honoring the decedent's intent to treat a child as if the child were the decedent's and not as an equitable estoppel jurisdiction.

Id. at 618-19 (cleaned up).

The Supreme Court of Iowa explained that adoption by estoppel "precludes adoptive parents and their privies from asserting the invalidity of adoption proceedings" or the status of the adopted child where there was performance by the child, the adoptive parents received the benefits and privileges accruing from the performance, and the adoptive parents through representations induced the child's performance "under the belief of the existence of the status of adopted child." Id. at 619 (cleaned up). Applying those principles, the Supreme Court concluded that the collateral heirs, who challenged the equitable adoption in that case, were estopped from disputing an equitably adopted child's "right to take, by virtue of the agreement to adopt, the share she would have taken had there been a legal adoption." Id. at 620. The Supreme Court determined that the record demonstrated that the child was treated by the adoptive parents as their daughter, that she was known as their daughter in the schools, church, and community, and that her children were acknowledged and treated by the adoptive parents as their grandchildren. See id. The Supreme Court determined that the record supported the trial court's finding that there was an agreement to adopt that was never legally completed and concluded that the child had fully and faithfully performed her part of the agreement. See id.

In Cubley v. Barbee, 73 S.W.2d 72, 79-80 (Tex. 1934), the Supreme Court of Texas concluded that the doctrine of equitable estoppel

> preclude[s] adoptive parents and their privies from asserting the invalidity of adoption proceedings, or, at least, the status of the adopted child, when, by performance upon the part of the child, the adoptive parents have received all the benefits and privileges accruing from such performance, and they by

- 29 -

their representations induced such performance under the belief of the existence of the status of adopted child.

(Cleaned up). In <u>Cubley</u>, <u>id.</u> at 73, after a decedent died intestate, a claimant brought a suit against the defendants, who were the heirs of a deceased son of the decedent, seeking to establish her rights in the estate based upon adoption or attempted adoption. When the claimant was a child, her mother signed an agreement relinquishing the child to the decedent and her husband, who signed and acknowledged an "adoption paper." <u>Id.</u> at 73-74. The Supreme Court observed that although the deed of adoption and relinquishment agreement could not be found, the evidence in the case demonstrated that the decedent and her husband intended there to be a deed of adoption and acted in a manner consistent with there being a deed of adoption. <u>See id.</u> at 78. The Supreme Court concluded that, after her husband's death, the decedent carried out the terms of the agreement, received its benefits, held the claimant out to the public as her adopted daughter, and otherwise treated the claimant as a daughter, including telling the claimant's biological mother that the deed of adoption was valid and had been filed as required by law. <u>See id.</u> at 79. The Supreme Court explained that the representations in the case could not be denied by the defendants because they were in privity with the decedent, "who would be estopped to deny the existence of the state of facts as represented by her, if she were a party to th[e] litigation." <u>Id.</u> Moreover, the claimant, "in a full measure performed every duty to be performed by her contemplated by the deed of adoption[.]" <u>Id.</u> As such, the Supreme Court held that the defendants were "plainly estopped from asserting the invalidity of the deed of adoption[.]" <u>Id.</u> at 83. The Supreme Court stated that, to permit the defendants to assert the invalidity

would be a fraud upon the rights of the equitably adopted child, and that the claimant was an heir entitled to a portion of the estate of the decedent. See id.

In Lankford v. Wright, 489 S.E.2d 604, 605 (N.C. 1997), the Supreme Court of North Carolina held that the doctrine of equitable adoption would be recognized in the state. In Lankford, id., when the plaintiff was a child, her biological mother entered into an agreement with neighbors for them to adopt and raise the plaintiff as their own child. The plaintiff moved into the neighbors' house, was given their last name, and was known as their only child. See id. The neighbors held the plaintiff out to the public as their child, who was at all times known by their surname, and the neighbors were referred to as the plaintiff's parents in school records, among other documents. See id. The adoptive father died and decades later the adoptive mother died intestate. See id. The plaintiff filed a declaratory judgment action seeking a declaration of her rights and status as an heir to the estate. See id. The defendants, who were administrators and named heirs, filed a motion for summary judgment, which was granted, and the North Carolina Court of Appeals affirmed, concluding that the plaintiff had not been adopted pursuant to the state's adoption statutes and that the state does not recognize the doctrine of equitable adoption. See id. at 605-06.

The Supreme Court disagreed and concluded that the doctrine of equitable adoption should be recognized in North Carolina, stating:

> It is a fundamental premise of equitable relief that equity regards as done that which in fairness and good conscience ought to be done. Equity regards substance, not form, and will not allow technicalities of procedure to defeat that which is eminently right and just. These principles form the essence of the doctrine of equitable adoption, and it is the duty of this Court to protect

and promote them.

Id. at 606 (cleaned up). The Supreme Court stated that the doctrine of equitable adoption is applied for purposes of intestacy "to give effect to the intent of the decedent to adopt and provide for the child[,]" and is predicated on contract principles and equitable enforcement of an agreement to adopt. Id. (cleaned up). The Supreme Court also stated that, "[a]s an equitable matter, where the child in question has faithfully performed the duties of a natural child to the foster parents, that child is entitled to be placed in a position in which he would have been had he been adopted." Id. Based on estoppel principles, if the child performs, other individuals making claims "under and through the deceased" are estopped from asserting that the child "was not legally adopted or did not occupy the status of an adopted child." Id.

The Supreme Court set forth the following elements as necessary to establish the existence of an equitable adoption in North Carolina: (1) an express or implied agreement to adopt the child; (2) reliance on the agreement; (3) performance by the biological parents by giving up custody; (4) performance by the child by living in the foster parents' home and acting as their child; (5) partial performance by the foster parents by taking the child into their home and treating the child as their own; and (6) the foster parents die intestate. See id. at 606-07 (citation omitted). The Supreme Court concluded that the record in the case demonstrated that each element had been satisfied by clear and convincing evidence, where, among other things, the neighbors agreed to adopt the plaintiff, the neighbors and the plaintiff relied on the agreement, and the plaintiff acted as the neighbors' child. See id. at 607.

- 32 -

## Intent-to-Adopt Jurisdictions

The "intent-to-adopt" approach does not rest on contract principles or those of equitable estoppel, but rather on the "considerations of fairness and intent" that the child should have been adopted absent the decedent's inadvertence or fault. Ford, 82 P.3d at 752 (citation omitted). In Ford, id. at 749, the Supreme Court of California held that "no equitable adoption is shown unless the parties' conduct and statements clearly and convincingly demonstrate an intent to adopt." In Ford, id. at 748-49, the claimant sought the right to inherit the intestate estate of a decedent as his equitably adopted son. The claimant was born in 1953, declared a ward of the court, and placed in the home of the decedent and his wife as a foster child in 1955. See id. at 749. In 1958, the claimant "was declared free of his mother's control[,]" and the claimant lived continuously with the decedent for approximately twenty years, until 1975. Id. The foster parents cared for other foster children during part of the time that the claimant lived with them but, even after they stopped taking in foster children, they retained custody of the claimant. See id. Although the claimant knew his foster parents were not his biological parents, he called them mom and dad and had a sibling-like relationship with their daughter, and the couple treated the claimant like their son. See id. The couple never petitioned to adopt the claimant, but his foster mother told a family friend that they wanted to adopt him. See id. When the claimant sought the right to inherit his foster father's entire estate, the trial court ruled against him, finding that the doctrine of equitable adoption was not applicable because there was not clear and convincing evidence of an intent to adopt. See id. at 749-50. The Court of Appeal affirmed. See id. at 750.

The Supreme Court of California reviewed the evolution of case law in the state concerning equitable adoption and concluded that, although prior cases had described equitable adoption as involving the specific enforcement of a contract to adopt, the doctrine "rested less on ordinary rules of contract law than on considerations of fairness and intent for . . . the child 'should have been' adopted and would have been but for the decedent's 'inadvertence or fault.'" Id. at 752 (citation omitted). The Supreme Court observed that specific performance is an unrealistic description of equitable adoption because specific performance of a contract to adopt is impossible after the death of one of the parties who gave the promise. See id. The Supreme Court pointed out that the contracts supposedly being enforced were made between foster parents and minor children, yet courts did not address the child's capacity to contract, which suggested that "the contract served mainly as evidence of the parties' intent, rather than as an enforceable legal basis for transmission of property." Id. at 752-53 (cleaned up).

The Supreme Court rejected the estoppel theory of equitable adoption, stating that, although California law on equitable adoption has rested on contract principles, the state "does not recognize an estoppel arising merely from the existence of a familial relationship between the decedent and the claimant." Id. at 753. The Supreme Court explained that the law of intestate succession is meant to carry out the intent that a decedent without a will would most likely have had and that the existence of a familial relationship, without any expression by the decedent of an intent to adopt the claimant or to have the claimant treated as a legally adopted child, "sheds little light on the decedent's likely intent regarding distribution of property." Id. The Supreme Court stated that, in California, equitable

- 34 -

adoption is not "a means of compensating the child for services rendered to the parent" or "a device to avoid the unjust enrichment of other, more distant relatives who will succeed to the estate under the intestacy statutes." Id. The Supreme Court expressed concern with looking only at the parties' relationship instead of to expressions of intent to adopt, as such an approach would improperly broaden the scope of equitable adoption to include claims of inheritance from the estate of any foster parent or stepparent who treats a foster child or stepchild lovingly and the same as any natural or legally adopted children. See id. at 753-54.

The Supreme Court of California concluded that, with respect to equitable adoption, a claimant must show by clear and convincing evidence "the existence of some direct expression, on the decedent's part, of an intent to adopt the claimant." Id. at 754. The Supreme Court described the requisite intent as follows:

> This intent may be shown, of course, by proof of an unperformed express agreement or promise to adopt. But it may also be demonstrated by proof of other acts or statements directly showing that the decedent intended the child to be, or to be treated as, a legally adopted child, such as an invalid or unconsummated attempt to adopt, the decedent's statement of his or her intent to adopt the child, or the decedent's representation to the claimant or to the community at large that the claimant was the decedent's natural or legally adopted child.

Id. (citations omitted). "Thus, in California the doctrine of equitable adoption is a relatively narrow one, applying only to those who though having filled the place of a natural born child, through inadvertence or fault have not been legally adopted, where the evidence establishes an intent to adopt." Id. (cleaned up). Although the Supreme Court discussed the manner in which the requisite intent may be established using a list of disjunctive

- 35 -

clauses, the Supreme Court also explained that, in addition to a statement or act by the decedent clearly showing the decedent's intent to adopt, a claimant must demonstrate that the decedent "acted consistently with that intent by forming with the claimant a close and enduring familial relationship." Id. (footnote omitted).

Based on the above principles, the Supreme Court concluded that, although the evidence demonstrated that the claimant and his foster parents enjoyed a close familial relationship, there was no evidence that the foster parents ever attempted to adopt the claimant or promised or otherwise stated their intent to do so. See id. at 755. For example, the foster parents never held out to the public that the claimant was their natural or adopted child or told the claimant that he was their child. See id. The Supreme Court stated that the foster mother's lone statement to a family friend "was not clear and convincing evidence that [the foster father] intended [the claimant] to be, or be treated as, his adopted son." Id. Accordingly, the claimant failed to prove a claim of equitable adoption. See id.

In DeHart, 986 N.E.2d at 103, the Supreme Court of Illinois stated that it would adopt the Supreme Court of California's holding in Ford and held "that a plaintiff bringing an equitable adoption claim must prove an intent to adopt along the lines described in *Ford* and, additionally, must show that the decedent acted consistently with that intent by forming with the plaintiff a close and enduring familial relationship." With respect to the intent to adopt and form a close familial relationship, the Supreme Court of Illinois stated the intent is not just "the mere intention to provide a good home, but must instead indicate a clear intent to adopt or to continuously represent to the plaintiff and the world at large that the plaintiff was the decedent's natural child." Id. at 104.

In DeHart, id. at 89, the plaintiff filed a complaint against the decedent's widow, contesting the decedent's will and raising claims, such as lack of testamentary capacity, undue influence, contract for adoption, and equitable adoption. During the decedent's lifetime, for more than sixty years, the decedent held the plaintiff out to individuals and institutions as his biological son, and even provided the plaintiff with a birth certificate listing himself as the plaintiff's natural father. See id. at 90. In 2000, when he was in his mid-50s, the plaintiff discovered that the birth certificate was not accurate. See id. When confronted, the decedent told the plaintiff that he adopted him in 1946, when the plaintiff was two years old, and that he had agreed with the plaintiff's biological mother, whom he married, to keep the adoption secret. See id. There was no documentation of a legal adoption, though. See id. After the confrontation, the decedent continued to hold the plaintiff out as his son. See id. In 2005, when he was 83 years old, the decedent married a 54-year-old woman. See id. One year later, the decedent signed a will stating that he had no children. See id. at 91. After the decedent's death, the plaintiff filed a complaint challenging the will and alleging, among other things, that the decedent had entered into a contract to adopt him and that, in any event, an equitable adoption had occurred. See id. The trial court dismissed the complaint and the appellate court reversed. See id. at 91-92. The Supreme Court of Illinois affirmed the judgment of the appellate court, concluding that the plaintiff had alleged sufficient facts to avoid dismissal of the equitable adoption claim. See id. at 104-05.

The Supreme Court stated that, in jurisdictions where the doctrine is recognized and based on a contract to adopt theory, "the most important prerequisite to its application is

proof that a contract of adoption was entered into between the foster parents and the natural parents or someone standing *in loco parentis*." Id. at 100 (cleaned up). The Supreme Court observed, though, that a few states, including California and West Virginia, do not require "that an expressed or implied contract to adopt exists before finding that an equitable adoption has occurred." Id. at 101 (citations omitted). The Supreme Court adopted the holding in Ford that, to establish an equitable adoption, an intent to adopt must be proven. See DeHart, 986 N.E.2d at 103.

The Supreme Court of Illinois stated that, in Ford, 82 P.3d at 754, the Supreme Court of California indicated that intent to adopt could be proven "by showing that the decedent represented to the plaintiff and the community at large that the plaintiff was the decedent's natural or legally adopted child." DeHart, 986 N.E.2d at 103 (cleaned up). The Supreme Court rejected the argument that recognizing equitable adoption in the absence of a contract to adopt would have detrimental consequences, and described its holding as one of "limited nature[,]" stating that "only in those cases where there is sufficient, objective evidence of an intent to adopt (or fraudulently or mistakenly holding out as a natural child on a continual basis), supported by a close enduring familial relationship, will an equitable adoption be recognized." Id. at 103-04. The Supreme Court opined that the nature of its holding would foreclose "claims against the estate of *any* foster parent or stepparent who merely treats a foster or stepchild lovingly and on an equal basis with his or her natural or legally adopted children[,]" and noted that a plaintiff must prove a claim of equitable adoption by clear and convincing evidence. Id. at 104.

In North Ford, 200 A.3d at 1208, the District of Columbia Court of Appeals held

that "an individual may claim equitable status as a decedent's child, but only in the strictly limited circumstance where he proves by clear and convincing evidence that the decedent took him in as a minor and, from that time on, objectively and subjectively stood in the shoes of his parent."[9]  The Court determined that the term "child" as used in the applicable intestacy statute was unambiguous and did not apply to the claimant if he was not legally adopted.  Id. at 1212.  The Court looked to whether, as a matter of equity, the claimant should be considered to be a child for purposes of the intestacy statute.  See id.  The Court observed that other jurisdictions have based equitable adoption in principles of implied contract and specific performance, and, citing Browning, 333 Md. 281, 635 A.2d 373, identified Maryland as a jurisdiction that uses this approach.  See North Ford, 200 A.3d at 1214.[10]  According to the Court, those jurisdictions require a claimant to demonstrate the existence of an unperformed contract or agreement to adopt, which has courts focusing on whether a contract was formed rather than attempting to discern who the decedent wished

---

[9]In North Ford, 200 A.3d at 1208, the decedent died intestate with no biological offspring, although she raised several children in her home, including the claimant and his older biological brother, whom she took in when the claimant was only a few months old. The decedent obtained a Social Security card for the claimant bearing her surname and not his birth surname, she enrolled him in school, she held herself out as his mother, and the claimant believed himself to be her adopted child. See id. at 1208-09. Eight years after the decedent's death, the claimant moved back into the decedent's home believing he had inherited the property. See id. at 1209. Years later, the claimant filed in the trial court a motion asking the court to recognize his right to inherit as an adopted or equitably adopted child. See id. The trial court denied the motion and determined that the claimant was not the decedent's biological or formally adopted child and stated that the District of Columbia does not recognize equitable adoption. See id. at 1209-10. The District of Columbia Court of Appeals reversed the trial court's ruling and remanded the case to the trial court for an evidentiary hearing. See id. at 1216.

[10]Before today, though, this Court had not expressly adopted a specific equitable adoption theory.

to have inherit.  See id.  But, the Court pointed out that evidence of an unratified agreement to adopt may suggest that the decedent, at one point in time, intended to adopt the claimant but then had a change of mind.  See id.

The Court observed that some jurisdictions base equitable adoption on principles of equitable estoppel, which generally require a showing of detrimental reliance.  See id.  The Court expressed concern, explaining that it would be unlikely that a child, particularly one taken in by a decedent as an infant, would have changed behavior or performance depending on whether the child expected to inherit and that, in any event, the child would have no equitable interest in inheriting absent proof of a promise by the decedent to devise property to the child.  See id.  Instead, the Court stated that "the equitable interest is in ensuring that the decedent's wishes regarding the disposition of her property are realized." Id.

Citing Ford, 82 P.3d at 754, DeHart, 986 N.E.2d at 103, and Wheeling, 250 S.E.2d at 372, 373, the District of Columbia Court of Appeals observed that a third group of jurisdictions "generally seek[] to promote fairness and to honor the intent of the decedent to treat a child as if the child were the decedent's own."  North Ford, 200 A.3d at 1214. The Court determined that it would "align" with those jurisdictions and "focus on the decedent's intent and [an] examination of whether the claimant was functionally the decedent's child."  Id. (footnotes omitted).  The Court concluded that a claimant seeking to establish that the claimant "is an intestate decedent's child and heir as a matter of equity[] must prove that the decedent objectively and subjectively stood in the shoes of [the claimant's] parent[,]" meaning, at a minimum, the claimant "must prove that, as a minor,

the decedent gave [the claimant] a permanent home." Id. at 1215. The Court stated that a court should consider the following facts concerning the nature of the relationship between the claimant and decedent:

> whether the decedent cared for the putative child (i.e., took charge of his health, education, and general welfare) until he reached the age of majority, as a parent would; whether the putative child was incorporated into the decedent's broader family; whether the decedent gave the putative child her surname; and whether the decedent held herself out to others in the community as a parent to the putative child. The court may also consider whether the putative child continued to maintain a relationship with his biological family and if so, if that relationship was inconsistent with the decedent assuming the role of parent to the putative child.

Id.

### E. Applying the Principles Above to this Case

Applying the principles discussed above to this case, we hold that, where a decedent dies intestate and has no surviving spouse or domestic partner, biological or legally adopted children, parents, siblings, or grandparents, a claimant may establish the right to inherit under the doctrine of equitable adoption by demonstrating clear and convincing proof of the decedent's intent to adopt and that the decedent acted in accord with that intent. We conclude that a person claiming equitable adoption first must demonstrate the existence of a "direct expression, on the decedent's part, of an intent to adopt the claimant." Ford, 82 P.3d at 754. This intent may be shown by proof of an unperformed express agreement or promise to adopt. See id. In addition, the requisite intent may be shown by "proof of other acts or statements directly showing that the decedent intended the child to be, or to be treated as, a legally adopted child, such as an invalid or unconsummated attempt to adopt[ or] the decedent's statement of [an] intent to adopt the" claimant. Id. As a second step, a

claimant must demonstrate both that the decedent represented to the public or to the community at large that the claimant was the decedent's natural or legally adopted child and that the decedent treated the claimant as such.  See id.[11]

Case law in Maryland has discussed the theories of contract and equitable estoppel as methods of equitable adoption.  See Besche, 190 Md. at 547-48, 59 A.2d at 503-04; McGarvey, 311 Md. at 238, 533 A.2d at 692-93; Browning, 333 Md. at 288, 635 A.2d at 377.  Just as we recognized in Besche, 190 Md. at 543, 59 A.2d at 501, and the courts in Ford, 82 P.3d at 752-53, and North Ford, 200 A.3d at 1214, recognized, however, there are multiple concerns with basing proof of equitable adoption on a contract theory.  A contract-based approach to equitable adoption essentially involves identifying whether an unperformed contract exists between the decedent and a claimant, which is capable of being enforced after the decedent's death.  See Besche, 190 Md. at 543, 59 A.2d at 501.  As we explained in Besche, id. at 543, 59 A.2d at 501, a claimant would have been unable to bring a claim for specific performance against the decedent during the decedent's lifetime due to the lack of an available remedy and because services performed by a child would be involved.  In addition, we noted that, in Maryland, "adoption is not a contract alone between the parties.  It requires judicial determination of the advisability of

---

[11]We are aware that, in Ford, 82 P.3d at 754, the Supreme Court of California phrased this clause as the decedent representing "to the claimant or to the community at large that the claimant was the decedent's natural or legally adopted child[.]"  (Citations omitted).  We do not include representations made "to the claimant" as part of the second step in our test.  In our view, including in the second step of the test that the decedent must represent to the claimant that the claimant is like an adoptive child would be essentially duplicative of the requirement of the first part of the test—that the claimant demonstrate the existence of some direct expression by the decedent of an intent to adopt the claimant.

permitting such action[.]" Id. at 544, 59 A.2d at 501. And, as the Supreme Court of California explained in Ford, a contract-based approach may involve issues with respect to a minor's capacity to contract and the enforceability of contracts where the claimant is a minor when the contract to adopt is formed. See Ford, 82 P.3d at 753 (The Supreme Court of California noted that, in previous cases, "the contracts purportedly being enforced were made between foster parents and their minor charges, yet neither court addressed the children's capacity to contract[.]").

Another problem with adopting a strict contract-based approach to establishing equitable adoption is the circumstance that there may be sufficient evidence that, at one time, a contract existed, *i.e.*, that at one point the decedent had the intent to adopt, but the decedent may later have experienced a change of heart and desired to withdraw from or rescind the contract, leaving the contract unperformed. See North Ford, 200 A.3d at 1214. In the event of a claim for equitable adoption, because the decedent would not be available to testify as to the reasons the contract was not performed, it would be difficult, if not impossible, for a court to determine the status of the contract or the decedent's intent based solely on the existence of an unperformed contract and to conclude that a valid contract continued to exist. See id. ("[O]ne could argue that evidence of an unratified agreement to adopt cuts against a claim for equitable status as the decedent's 'child,' as it could suggest that the decedent at one point intended to make the child a permanent family member, but then changed her mind.").

Like the contract-based approach, the estoppel approach has been subject to criticism. With the estoppel approach, as the Supreme Court of Iowa and the Supreme

Court of Texas explained in Painter's Est., 67 N.W.2d at 619, and Cubley, 73 S.W.2d at 79-80, respectively, the analysis centers on the relationship between a claimant and decedent and a claimant's performance and reliance on the relationship rather than on the intent of a decedent to adopt. See also North Ford, 200 A.3d at 1214 ("Other states rely on principles of equitable estoppel, which generally requires a showing of detrimental reliance[.]" (Citations omitted)). In North Ford, 200 A.3d at 1214, the District of Columbia Court of Appeals explained that one of the drawbacks with an estoppel approach is that it would be unlikely that a claimant, especially a claimant who is taken in as a baby by a decedent, would have changed behavior or performance based on an expectation of inheritance, *i.e.*, it is unlikely that there would be detrimental reliance. Moreover, as the Court in North Ford, id., stated, the equitable interest embodied in the principle of equitable adoption is in "ensuring that the decedent's wishes regarding the disposition of her property are realized[,]" not the claimant's inheritance right or reliance.

Under the two-step test that we announce today, first, proof of intent to adopt is required, which may be in the form of a direct expression on the decedent's part of an intent to adopt the claimant, and, as the second step, the claimant must demonstrate that the decedent held out to the public that the claimant was considered to be the decedent's natural or legally adopted child and that the decedent treated the claimant as a natural or legally adopted child.[12] With this two-part test, we ensure that a decedent's intent to adopt, once

---

[12]To the extent that we have previously indicated that an equitable adoption may be established though proof of an unperformed contract or agreement to adopt or based on principles of equitable estoppel alone, the standard we announce today supersedes that discussion. See McGarvey, 311 Md. at 234, 238, 533 A.2d at 690-91, 692-93.

- 44 -

expressed, is confirmed by evidence that the decedent acted in accord with the intent expressed.[13]

Although the Supreme Court of California appeared to indicate in Ford, 82 P.3d at 754, that a decedent's intent can be demonstrated through an expression of intent such as proof of an unperformed contract or agreement to adopt *or* representing to the claimant or to the community that the claimant is a natural or adoptive child, throughout its opinion in Ford, the Supreme Court of California's discussion of the doctrine of equitable adoption supports the conclusion that there must be proof both of an intent to adopt and that the decedent acted in accord with the intent. At the outset of its discussion of criteria for equitable adoption, the Supreme Court described the "essence" of the doctrine as allowing "a person who was accepted and treated as a natural or adopted child, and as to whom adoption typically was promised or contemplated but never performed, to share in inheritance of the foster parents' property." Id. at 750. In other words, both an intent to adopt and action, such as treatment of the claimant as a natural or adopted child, are required. In another instance, the Supreme Court stated that "[t]he existence of a mutually affectionate relationship, without any direct expression by the decedent of an intent to adopt the child or to have him or her treated as a legally adopted child, sheds little light on the decedent's likely intent regarding distribution of property." Id. at 753. In other words, the Supreme Court stated that actions or treatment of a child as a natural or legally adopted

---

[13]The decedent treating the claimant as a natural or legally adopted child in a manner sufficient to support the decedent's intent to adopt must continue up to, or at least not have been disavowed by the decedent before, the decedent's death. See Ford, 82 P.3d at 754 n.6.

child alone is not sufficient to establish equitable adoption; there must also be an intent to adopt expressed by the decedent.

The Supreme Court of California explained that a rule that focuses on the parties' relationship, rather than on expressions of intent to adopt, creates an unworkable and subjective rule that would permit claims against the estate of any foster parent or stepparent who treats a claimant lovingly and like a natural or legally adopted child. See id. at 753-54. With this statement, the Supreme Court again put in plain words that treatment of a claimant as a natural or adopted child alone is not enough without there also being proof of the intent to adopt. Further, after discussing how a decedent's intent to adopt may be shown, the Supreme Court stated: "In addition to a statement or act by the decedent unequivocally evincing the decedent's intent to adopt, the claimant must show the decedent acted consistently with that intent by forming with the claimant a close and enduring familial relationship." Id. at 754 (footnote omitted). Put simply, in Ford, despite describing examples of the circumstances that may demonstrate a decedent's intent to adopt in a series of disjunctive clauses ending with a decedent's representation to a claimant or to the community at large that the claimant was the decedent's natural or legally adopted child, it is clear that the Supreme Court of California expressed the view that to prove equitable adoption, a claimant must demonstrate both the decedent's intent to adopt through evidence of "some direct expression" of the intent and proof that the decedent acted in a manner consistent with that intent. Id.

Although the Supreme Court of California appeared to describe the factor concerning a decedent's representation to the claimant or to the community at large that

the claimant was the decedent's natural or legally adopted child as a standalone factor that could be dispositive in determining a decedent's intent, to avoid setting the bar too low and potential confusion, we include this factor as the second step of a two-part inquiry. In contrast, in DeHart, 986 N.E.2d at 103, the Supreme Court of Illinois interpreted the last clause of the test set forth in Ford—that intent can be proven by showing that a decedent represented to the claimant or to the community at large that the claimant was the decedent's natural or legally adopted child—as meaning that a decedent who holds a child out to be a natural child has demonstrated an intent to adopt. We decline to establish such a broad standard. Because representing to a claimant or even representing to the public that a child is considered a legally adopted or natural child may not be indicative of an intent to adopt, we conclude that these circumstances alone should not be independent factors establishing proof of a decedent's intent to adopt. Stated otherwise, although a decedent may represent to the public or to a claimant that the decedent views the claimant as a natural or legally adopted child, this does not lead to the conclusion that the decedent necessarily had the intent to adopt the claimant or an intent that the claimant become the decedent's heir.

As can be seen by the Supreme Court of Illinois's adoption of Ford in DeHart, the last clause of the Ford standard is subject to an interpretation that is not consistent with the Supreme Court of California's otherwise fulsome discussion of the requisite intent to adopt and may result in establishing a standard for demonstrating equitable adoption that does not necessarily reflect a decedent's intent. The Supreme Court of Illinois interpreted Ford as holding that a decedent's intent to adopt can be established by proof that a decedent

"continuously represent[ed] to the [claimant] and the world at large that the [claimant] was the decedent's natural child." DeHart, 986 N.E.2d at 103-04. This interpretation informs our resolve to make clear that the intent-based test approach is a two-step one involving, first, proof of a decedent's intent to adopt through evidence of a direct expression of the intent and, second, proof that the decedent acted in a manner consistent with that intent by holding the claimant out to the public as the decedent's natural or legally adopted child and treating the claimant as a natural or legally adopted child.

We note that the two-step test that we adopt today differs from the test that the Appellate Court used in this case, which focused on the decedent's intent to treat the claimant as a natural or legally adopted child and not on the decedent's intent to adopt the claimant. As we see it, because the purpose of the doctrine of equitable adoption is to effectuate equitable inheritance where an individual dies intestate, see, e.g., Browning, 333 Md. at 287-88, 635 A.2d at 377, it makes sense that a decedent's intent to adopt should govern the analysis. The intestacy statute's purpose "is to make such a will for an intestate as he would have been most likely to make for himself[.]" Barron v. Janney, 225 Md. 228, 234-35, 170 A.2d 176, 180 (1961) (footnote omitted). An analysis of the decedent's intent to adopt examines whether the decedent intended to adopt a claimant, and as a result, attempts to achieve the outcome as to inheritance that the decedent would most probably have wanted to achieve.

Our holding is limited to the circumstance of this case—inheritance from an intestate decedent who died with no surviving spouse, registered domestic partner, surviving issue, parents, siblings, or grandparents—where a claimant, such as a stepchild,

can satisfy the two-part test we adopt today. We have previously held that an equitably adopted child cannot inherit through an adoptive parent from relatives of the parent, see Browning, 333 Md. at 293, 635 A.2d at 379-80, and cannot benefit from better inheritance tax rates for direct lineal descendants, see McGarvey, 311 Md. at 234, 243, 533 A.2d at 690, 695. These holdings help to ensure that the doctrine of equitable adoption does not infringe on the importance and impact of statutory adoption. We reaffirm those holdings today.

In McGarvey, 311 Md. at 240, 533 A.2d at 694, we explicitly rejected the Supreme Court of Appeals of West Virginia's approach that legal adoption could be achieved through both equitable adoption and formal judicial adoption, conferring legal status to both. We see no reason to change course and embrace so broad an approach now, either. Our holding concerning equitable adoption applies only to inheritance from an intestate decedent—*i.e.*, our holding instills no more than an inheritance right where a claimant can prove, by clear and convincing evidence, under the standard that we establish today, that an intestate decedent, who died with no surviving spouse, registered domestic partner, surviving issue, parents, siblings, or grandparents, intended to adopt the claimant and acted in accordance with the intent.

At oral argument, Petitioners' counsel pointed out that the General Assembly has determined that stepchildren may only inherit in intestacy if there are no surviving blood relatives. Petitioners' counsel appeared to argue that Ms. Ellis, a stepchild, should not be permitted to inherit under the doctrine of equitable adoption because the General Assembly has already spoken in the intestacy statute, ET § 3-104(c), about when stepchildren may

inherit. To be sure, ET § 3-104(c) indicates, without qualification, that a stepchild may inherit from a stepparent if the stepparent has no remaining blood relatives. The intestacy statute is silent, however, as to the intent of the decedent. The doctrine ensures an equitable result and that a decedent's intent is fulfilled. Applying an intent-to-adopt approach does not "create a new class of heirs[,]" as Petitioners' counsel has argued; rather, where a decedent dies intestate, it permits inheritance in a manner that is aligned with the intent of the decedent.[14]

Ms. Ellis must prove by clear and convincing evidence, in the manner prescribed, the Decedent's intent to adopt her and that the Decedent acted in a manner consistent with that intent. The standard sets a high bar, and for good reason. As the Supreme Court of California stated in Ford, 82 P.3d at 754-55, a claim for equitable adoption is based on a relationship with a person who can no longer testify as to intent, and because the claim rests on the principle of inherent justice, the need for justice "should appear clearly and unequivocally from the facts." (Citations omitted). Although the standard of proof is high, given the nature of the intent and relationship being asserted, the standard should not pose too great an obstacle to valid claims of equitable adoption.

For the reasons set forth herein, we reverse the judgment of the Appellate Court and

---

[14]Petitioners also argued that Ms. Ellis is precluded from equitable adoption status because she cannot inherit from both the decedent and Mr. Klenk, her biological father, but this issue is not before this Court. The argument was not raised in or decided by the orphans' court and was not raised in petition for writ of *certiorari*. As such, we decline to address the issue or to hold that the lack of resolution of the issue would be an impediment to a finding of equitable adoption by a stepparent because there is a living natural parent who is not married to the stepparent.

remand the case to that Court with instruction to remand the case to the orphans' court for

a determination of the Petition to Transmit Issues and Demand for Jury Trial based on the

standard set forth in this opinion.[15]

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE ORPHANS' COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. PETITIONERS TO PAY COSTS.**

---

[15]Like the Appellate Court, we do not address the question of whether or under what circumstances the orphans' court may transmit issues to the circuit court for trial by jury. See Schappell, 260 Md. App. at 564, 310 A.3d at 1199. As stated above, in Shealer, 459 Md. at 82, 184 A.3d at 399, we observed that the General Assembly has authorized the orphans' court to "direct any issue of fact to be tried by plenary proceedings and with the help of a jury." (Cleaned up). In this case, on remand, in the event that the orphans' court transmits issues to the circuit court for determination by a jury, the orphans' court should explain in its written order or opinion the basis for having ordered that the issues be subject to trial by jury.